DARDEN *v.* AMERICAN BANK & TRUST CO. *et al.*

(Division B.   Nov. 3, 1930.)

[130 So. 508.   No. 28852½.]

Watkins, Watkins & Eager, of Jackson, for appellant.

**Brunini & Hirsch,** of Vicksburg, for appellees.

**Griffith, J.,** delivered the opinion of the court.

The Hurricane plantation, situated on·an island in the river about twenty miles below Vicksburg, had in the year 1911 become heavily indebted, and among the means to provide for its obligations there was a bond mortgage placed upon it for twenty-five thousand dollars. The bonds became the property of the American Bank & Trust Company, to cover in part a previous debt. The bank had made various other loans on plantation property,

and, by reason of adverse conditions, the bank had been compelled to acquire real estate and plantation securities in an overlarge amount, to the embarrassment of the convenient operation of the bank. Dr. G. T. Darden, appellant's testate, a wealthy resident of Sharkey county, was a large depositor in the bank, and was on terms of intimate friendship with some of those directly interested in the bank's welfare. In this situation, on April 29, 1912, Mr. Thos. Rose, then the active manager of the bank, induced Dr. Darden to take over from the bank for cash at face value an amount of bonds aggregating more than sixty thousand dollars, and, to evidence the transfer of the title thereof, a memorandum somewhat similar in form to a bill of sale was on said date executed by the bank to Dr. Darden, and, in turn, there was an indorsement by the bank on this memorandum that the bonds were to be held by it as trustee. The Hurricane bonds were included in this transaction.

Evidently Dr. Darden was not willing to purchase the said Hurricane bonds outright, as being surely worth their face value in cash, without recourse, for on the same day the bank manager and Dr. Darden called into the conference Mr. R. L. McLaurin, who was a director of the bank, a close friend of Dr. Darden, and also the attorney both for the bank and Dr. Darden; and the parties stated to Mr. McLaurin in substance that it was desired that he should be the witness to an oral agreement between the bank and Dr. Darden to the effect that as to these Hurricane bonds the bank would redeem them at any time at face value on demand of Dr. Darden.

So far as the record shows, there was no other transaction between the bank and Dr. Darden from the date last mentioned, April 29, 1912, until March 28, 1917, other than that Dr. Darden continued as a large depositor and valued customer of the bank. The bonds remained in the bank, and still there remain, and the interest continued to be paid as due. On the date last mentioned,

the bank again prevailed on Dr. Darden to take over undesirable property—from the banking standpoint—and to purchase from it the Catalpa plantation in Washington county, at a purchase price of approximately forty-five thousand dollars. A deed of trust on the property to secure the purchase-money notes was executed by Dr. Darden, the notes extending through a series of five years, but on the same day the bank delivered to Dr. Darden a letter to the effect that, notwithstanding the maturities of said notes, Dr. Darden should have the privilege of paying them at any time at their face value, without bonus. On the same day there was also delivered to Dr. Darden another letter reading as follows:

"The American Bank & Trust Company
"Vicksburg, Mississippi.
"March 28, 1917.

"Dr. G. T. Darden, Blanton, Miss. Dear Doctor: In reference to the agreement heretofore had with this Bank, made while Mr. Thos. Rose was in control, and with him, to the effect that this Bank would redeem from you at any time you demanded it, the Hurricane Bonds for twenty-five thousand dollars, purchased by you from this Bank, I beg to state that it is now understood that you have the privilege, whenever you demand it, to turn in these bonds with accrued interest as so much cash against the debt owed by you for purchase money on Catalpa Plantation.

"Yours very truly,
"W. G. PAXTON, Manager."

On July 19, 1917, Dr. Darden sold Catalpa plantation to North and wife, who assumed the purchase-money notes due to the bank, and Mr. North on or about May 20, 1919, paid the said notes in full with interest. Prior to the deal and quoted letter of March 28, 1917, Mr. Rose, on account of failing health, had retired from the bank, and was succeeded as manager by Mr. Paxton, who, as a witness on the trial, stated in effect that he had no

present recollection of these transactions sufficient to enable him to give any dependable, material testimony concerning them. Dr. Darden died in 1923, and Mr. Rose is also dead. Mr. McLaurin is therefore the only person who could testify positively to the facts. The matter has found its way into litigation by reason of the fact that the interest on the Hurricane bonds was not paid on the due date, May 31, 1929, and appellant as the sole legatee under the will of Dr. Darden, on July 13, 1929, demanded of the bank that the said bonds be redeemed by it, which demand was refused.

It is insisted by appellee in the first place, and as its main contention, as we understand it, that the agreement made between Dr. Darden and the bank, to the effect that the bank would redeem the Hurricane bonds at any time demanded, was made after the contract of purchase of the bonds had been completed, after the instrument evidencing the sale had been executed and the check for the purchase money had been delivered; and that therefore the particular stated agreement was without consideration. After a careful review of this record and a deliberate consideration of all the surrounding facts and circumstances, we are of the opinion that the conclusion is inescapable that the agreement mentioned was a part and parcel of the main transaction, and, being integral, cannot now be separated into disconnected parts. From which it follows that the consideration of this integral part is supported by the consideration present in the support of the contract as a whole.

Appellee's next contention is that, conceding the consideration, the memorandum of agreement executed on April 29, 1912, evidencing the sale of these bonds was complete in itself, and cannot be added to or varied by oral evidence, so that it follows that the rights of appellant cannot be shown to be any other or further than conferred by the language of the letter of March 28, 1917. We will, for the purposes of this case, accept the latter

statement as correct, supplementing it, however, with the further statement that in interpreting the meaning of the expressions used in a letter or other writing the court must look to all the surrounding facts and circumstances. 13 C. J. pp. 543-544.

The letter in its opening statement refers to the agreement theretofore had with the bank. There is no sort of suggestion in the record that there had in the meantime been any agreement with the bank in respect to this matter other than the one made on April 29, 1912, and we have already mentioned that, so far as the record discloses, or even intimates, there was no other transaction of sale and purchase between the bank and Dr. Darden from April 27, 1912, to the date of the Catalpa plantation purchase on March 28, 1917. And certainly the Catalpa purchase was not the subject of any agreement between the parties on April 29, 1912, for that matter did not come up between them until five years later. There is not a word in the entire record that advances the slightest suggestion that the agreement of April 29, 1912, contemplated that the bank was to redeem the bonds only by crediting the same as purchase money on some future purchase of property from the bank by Dr. Darden.

We have already stated the salient facts and surrounding circumstances of the making of the agreement on April 29, 1912, but, to bring them forward now in direct connection, the facts were, in brief, that the bank was overloaded with real estate securities. Dr. Darden was on intimate terms with some of those directly interested in the welfare of the bank. He had a large deposit balance to his credit, and, being a man of much wealth, he had no immediate use for this ready capital. There arose, therefore, the willingness and ample ability to aid the bank by this arrangement, which would place the record assets of the bank in better shape, and at the same time, with the said bonds and the agreement of the bank to redeem, Dr. Darden would be secure from loss. And

it is easy to see why the bank management desired this arrangement to rest in parol rather than to be put in writing as a stated part of the agreement, namely, that, if the latter course had been taken, it might have been capable of the construction that the transaction was in effect a loan to the bank on the security of these bonds, thus seriously affecting the official periodical statements required by law to be made by the bank.

Further, and for an additional view of the circumstances as bearing upon the proper construction to be placed on the letter of March 28, 1917, we keep in mind that no other transaction occurred between the bank and Dr. Darden from April 29, 1912, down to said March 28, 1917. The bonds had remained all the while in the bank, and still remain there. The interest had been paid thereon as due, and none of the principal had matured. But on this latter date, March 28, 1917, the bank having on its hands the Catalpa plantation, requested Dr. Darden to purchase the plantation and to take it also off of the hands of the bank, which Dr. Darden agreed to do. It was a thing natural in the ordinary course—so much so as to be practically inevitable—that this outstanding oral agreement about these bonds would come up at this time, particularly in view of the fact that the Catalpa purchase involved the large amount of forty-five thousand dollars. It was inevitable that Dr. Darden, in consenting to undertake this Catalpa deal, would remind the bank of the previous agreement about these bonds, and would mention the fact that he had the oral obligation of the bank to redeem these bonds on demand, and that in virtue of that agreement he would have the right, if desired, to apply the same to the Catalpa purchase, and moreover, since he was giving notes and a deed of trust to the bank for the Catalpa purchase money, that he on his part should have the previous oral agreement put in some like written form, and it was equally the natural and proper thing for the bank as an honorable institution to

put in writing on request that which it had agreed to do orally, on which agreement it had received the money, in full and still retained the same, as the proceeds.

Thus we bring before our own minds the same picture that the bank manager had in his mind when he wrote the brief letter of March 28, 1917, so that we may see the mental process by which the letter in a few words confirmed the oral agreement of April 29, 1912, thus discharging that from mind, and how then there was added as the effect or an effect of that agreement that the bonds could be applied to the Catalpa purchase, thereby discharging also from mind the particular discussion just had on that subject. We must, if possible, give such an interpretation to the transactions of men especially of those who stand in high positions of trust and responsibility, and who have long been accredited as worthy of their positions, as will square their words and actions with good faith, fair dealing, and honest intention. Such was the position and standing of Mr. Paxton, who as manager of the bank wrote the letter in question. We must ascribe to such a man the purpose to fairly state the agreement in its full integrity as made. We must assume that, if he did not intend to fully recognize it, he would so say and put his declination on frank ground —one sustainable in law and in morals. We find no word in the record that indicates any purpose on his part at the time other than to deal openly and frankly and without question or equivocation. He was ready promptly to put in writing the previous oral agreement, and was ready to acknowledge its effect. He knew that in 1912, when the agreement was made, there was no such thing a part of it as that it should be limited to the purchase of Catalpa plantation, or any other purchase. If then, with these things before us, we are to say now that by his letter he nevertheless did intend to depreciate the agreement, and slyly sneak into it a limiting provision which he knew was not before the parties when the agree-

ment was made, and thus rob it of its original import, we must do so by giving him credit only for craftiness and none for square dealing. We refuse to adopt the interpretation which would place his letter in that light, for the terms used do not require any such interpretation. Rather, we interpret the letter, first, as confirming outright the previous oral agreement, and, second, as an additional statement, by way of further confirmation that an effect of that agreement is to permit these bonds to be used on the purchase price of the Catalpa deal. "In law every intendment that harmonizes with honesty and fair dealing must be presumed in the light of the facts." 22 C. J. pp. 146, 147; 13 C. J. p. 540; Wherry v. Latimer, 103 Miss. 524, 534, 60 So. 563, 642.

It is only by an inference, in any event, that the last words of the letter can be said to limit the application to Catalpa alone. There are no express words of exclusion or limitation. The concluding language of the letter which is contended to be a limitation can and therefore ought to be construed as a statement confirmatory of an effect, as presently applied to the particular case, of the previous language; not as the entire effect or the only effect, passed, present, or future. A dishonorable purpose cannot be worked out of language by inference, unless the inference is clear and free from reasonable doubt; besides which there is the principle that a party to a litigation cannot assert that which involves him in such a purpose and prevail on the strength of that assertion. There is to be added the farther consideration that throughout these years Dr. Darden had been not only a valued customer of the bank, carrying large balances, but, as shown, was otherwise ready to befriend it in large matters of benefit to the bank. It is inconceivable that in return the bank would adopt against him the devices of the trimmer and the cheat; and we hold that the bank did not so intend and did not so do.

Some contention is made that appellant cannot prevail in so far as the face value of the bonds are concerned, because, as contended, the letter of March 28, 1917, does not definitely cover this question, and because Mr. McLaurin at one point in his direct examination spoke of the redemption agreement as being for cash at their market value. However, on his cross-examination by appellee, when his attention was more definitely called to this feature, he corrected his statement, and stood upon the fact as his actual testimony that the agreement was that the bank would "redeem these bonds at any time at their face value." But we go again to the letter of March 28, 1917, and there we find the word "redeem," which in the text, as used, means more than merely to buy at the market price. We cannot comprehend what substantial use would be served to Dr. Darden by an agreement by the bank to purchase the bonds from him at the market price, since, if they should have a market price, he could readily sell them in the open market at that price. And suppose they should have no market price, or should become valueless, so far as the market is concerned, what then? Redeem in the connection used was meant, as we think, in the sense of a pure redemption, that is, to buy back, or receive back, by paying the obligation of the thing so retaken.

The decree will be reversed and the cause remanded, with directions to take an account or calculation under the principles herein maintained, and thereupon that a decree shall be entered in behalf of appellant.

Reversed and remanded.