TOMSHECK, Appellant, v. DORAN, Respondent.
No. 9196.
Submitted March 31, 1953. Decided April 30, 1953.
256 Pac. (2d) 538.

Mr. James A. Nelson, Shelby, for appellant.

Mr. W. M. Black, Shelby, Mr. Jerry J. O'Connell, Great Falls, for respondent.

Mr. Nelson and Mr. O'Connell argued orally.

MR. CHIEF JUSTICE ADAIR:

Suit in equity to rescind and cancel a contract for the sale

of 640 acres of particularly described rough unbroken rocky lands situate in sections 8 and 17, in township 33 north, range 3 west, M.M. in Toole county, Montana.

At the times here involved the plaintiff Tony Tomsheck possessed approximately 9,000 acres of similar lands located in the vicinity of the lands described in the contract all being used for stock raising or agricultural purposes and requiring the services of considerable farm labor.

In March 1951, the plaintiff, Tony Tomsheck, as first party, and the defendant L. G. Doran, as second party, executed a written contract whereby Tomsheck agreed to sell and convey to Doran and the latter agreed to buy from Tomsheck the particularly described 640 acres of land first above mentioned, it being expressly provided that no oil, gas or other minerals which may be produced and saved from said lands are included in such contract.

The $16,000 consideration for the contract was to be paid to Tomsheck in three years by delivering to him one-third of the value of the crops which Doran should harvest on the land each year with a provision that should hail or other weather conditions render Doran unable to pay the agreed price in full from one-third of the crop harvested each year for three years then the contract shall be extended for another year upon the same terms with Doran paying interest at the rate of 5% per annum on any unpaid balance due on the contract after the first year and Doran to pay all taxes assessed and levied upon the lands subsequent to the year 1950.

In the spring of 1951 and following the execution of the above contract, Doran cleared and picked and removed the rock from 320 acres of the described lands on which, after breaking and cultivating, he prepared a seed bed and planted a crop of rape.

In June 1951, Tomsheck and Doran had an argument over money due and for gas and oil which Doran claimed Tomsheck was to furnish for a pick-up truck used in the farming operations.

On August 23, 1951, the plaintiff Tony Tomsheck and J. Etta

Tomsheck, his wife, as first parties, and John M. Combs, as second party, made and executed a written contract wherein, for an agreed consideration of $28,800, Tomsheck and his wife contracted to sell and convey to Combs "in fee simple, free and clear of all encumbrances whatever, by a good and suf-ficient warranty deed," the identical 640 acres described in and covered by Doran's contract.

After entering into the above contract, Combs, assisted by his sons, commenced picking rocks from and doing off-set discing on the described lands.

Upon learning of such work being done on the lands which he had contracted to purchase, Doran proceeded to the premises and ordered Combs and his helpers "to get off the place."

Thereafter on September 17, 1951, Doran sent the following letter by registered mail to John M. Combs at his home address, viz. :

"Shelby, Montana
"September 17th, 1951

"Mr. John M. Combs,

"Conrad, Montana.

"Dear Sir,—It has recently come to my knowledge and information that recently you purchased the within described land from Tony Tomsheck of Shelby, Montana.

"This is to notify you that I purchased this same land from Tony Tomsheck under a Contract For Deed on the 31st day of March, 1951. I claim ownership of the two-thirds of this year's crop on said land.

"This land is described as;—

"W ½ of Section 17; The ¼ of NW ¼; of Section 17; The SW ¼ of Section 8; & The W ½ of SE ¼; of Section 8; & The SE ¼ of NW ¼; of Section 8; all in Twp. 33, North of Range 3 West, N. M. containing in all 640 acres.

"My contract for Deed was duly recorded in the Office of Toole County Clerk and Recorder.

"Therefore, this is to notify you not to take or harvest any of said crop or crops growing on the above land. My said Con-

tract for Deed is now and at all times in full force and effect. I am paying under my Contract for Deed $16,000.00 for this land. My first payment on this land is due and payable when the crop thereon is harvested. Kindly govern yourself accordingly.

"Yours truly,
"L. G. Doran"

Upon receiving the above letter John M. Combs immediately got busy and on September 18, 1951, entered into a new contract with Tony Tomsheck and wife for the purchase from them of a different 640-acre tract in lieu of the lands which Tomsheck had first contracted to sell to Doran and next to Combs.

On September 25, 1951, Tomsheck, by registered mail, sent the following written notice to Doran, viz.:

"Mr. Leonard G. Doran

"Shelby, Montana

"Dear Sir:

"Please take notice that Tony Tomsheck has rescinded the contract for deed hereafter described upon the ground the consideration for the obligation of Tony Tomsheck to convey has failed and upon the further ground that the consideration has not been rendered to Tony Tomsheck by you and fails in a material respect; namely, that you, the said Leonard G. Doran, on or about the 4th day of June 1951 failed, neglected and refused to perform the terms of a wage agreement dated March 31, 1951 between Tony Tomsheck and yourself for a term of three years, and that you have at all times thereafter wholly failed, neglected and refused to perform said terms.

"The contract for deed was executed contemporaneously with and as a part of, the wage agreement above mentioned, and is described as follows:

"Contract for deed dated the 31st day of March, 1951, executed by Tony Tomsheck as party of the First Part and Leonard G. Doran as party of the Second Part, for the purchase and sale of W ½ & NW ¼ NE ¼ of Section 17, SW ¼, W ½

SE ¼, SE ¼, NW ¼ of Section 8, in Township 33 North, Range 3 West, Toole County, Montana.

"Dated this 25th day of September, 1951.

"Tony Tomsheck
"Tony Tomsheck
"James A. Nelson
"By "James A. Nelson
"His Attorney"

On the following day, to wit, on September 26, 1951, Tomsheck, as plaintiff, filed this suit against Doran seeking to have rescinded, delivered up and cancelled the duly recorded contract of sale so entered into with Doran in March 1951.

As grounds for rescinding, Tomsheck pleads the breach by Doran of a certain independent and separate written employment agreement entered into with Doran which latter agreement makes no mention of the contract of sale. Likewise the contract of sale makes no mention of the employment agreement.

Doran challenged the sufficiency of Tomsheck's complaint by general demurrer and upon the overruling thereof, answered, placing in issue the alleged facts on which Tomsheck sought recission.

At a trial had before the court sitting without a jury, the plaintiff rested his case after introducing eight documentary exhibits and the testimony of four witnesses, viz.: (1) Plaintiff Tony Tomsheck, (2) J. Etta Tomsheck, (3) John C. Hoyt, and (4) John M. Combs.

The witness J. Etta Tomsheck, wife of the plaintiff, in part testified:

"Q. Do you know whether Mr. Doran worked on the 640 acres under the Contract for Deed? A. When?

"Q. From and after March 30, 1951? A. Yes; he did. He and my husband put the crop in together.

"Q. Have you any idea how many hours he worked? A. My husband has it all down there, the hours, in the book.

"Q. Would you say from your own knowledge, regardless of the memorandum, that Mr. Doran worked from' early in the

morning until late at night? A. He did and he set his own hours.

"Q. He set his own hours? A. Yes.

"Q. Do you know of your own knowledge that he cleared away this or a portion of the 320 acres on this land that was under the Contract for Deed—cleared it from rock and planted seed so that there would be a crop? A. He did all those things. I won't say he did it all. It might have been rocked to a certain extent prior to this time—even the year before. I don't keep too much track of what goes on on that ranch; I live here in town."

The plaintiff Tony Tomsheck, in part, testified:

"Q. Was there a crop of rape seed put on this acreage? A. Yes.

"Q. By whom was that crop put in? A. Doran and myself.

"Q. In order to put that crop in what had to be done? A. Got to be a seed bed made.

"Q. Before you could make a seed bed what had to be done? A. I furnished Doran a piece of machinery to go out there and we offset it.

"Q. Did you remove any rocks from the— A. Yes, sir; we did.

"Q. Removed all kinds of rocks; isn't that true? A. Yes. We had it kind of cut and dried to put in 320 acres and in order to do that we had to do a little more rocking there.

"Q. You said Doran didn't do anything and now you come around to say that Doran did help to get the rocks out— A. The wages show that he was there pretty near better than two months.

"Q. I am talking about the 640 acres he had contracted for deed—I am not talking about the wage agreement he had to work on your place. I am talking about the premises and the 640 acres involved in the Contract for Deed. Didn't Doran remove rocks from the 640 acres? A. Under my consent. He had my contract. Read that.

"Q. Did he do it? A. With my consent and with my other help—not alone.

"Q. Did Doran make the seed bed? A. With my consent. * * *

"Q. He made the seed bed? A. Yes.

"Q. And he put in the crop, didn't he? A. Well—I will tell you—if he put in three pounds per acre he—well, I asked him how much seed he was putting in and he said he didn't know—didn't even know—the seed was there and then he couldn't tell me how much seed he used. I'd say it was pretty poor judgment. * * *

"Q. Now, do you remember when Mr. Doran took the rocks off? Have you any idea of the dates he was engaged in taking rocks off? A. No.

"Q. Would you testify it was prior to June 4, 1951? A. You couldn't be doing that seeding later than that. It must have been before that.

"Q. Before June, 1951? A. Yes.

"Q. And the seed was planted before June 4, 1951? A. Yes, sir.

"Q. Have you any idea of the time the crop was harvested? * * * A. I would judge sometime in September by myself—really, I was stuck there trying to operate two combines and—well, I would say sometime in September.

"Q. Sometime in September? A. Yes. * * *

"Q. When you started negotiating with Mr. Combs for this same identical property had you told Mr. Combs anything about your difficulty with Mr. Doran? A. No, I did not. I thought that was my own trouble.

"Q. You didn't tell Combs anything about it? A. No. * * *

"Q. When you talked to Mr. Combs on the 18th of September, 1951, he notified you all about—he told you that Doran had notified him that this was his land? A. Yes; he told me. I believe he came into town and told Mr. Nelson. Someway or other Combs told me about it.

"Q. That Doran came out and gave him orders to get off because that was his land? A. Yes."

Plaintiff further testified:

"Q. Did you enter into any contracts subsequent to that with Mr. Combs? A. Yes; I did.

"Q. And you know the premises—what was the nature of the contract? A. With Combs?

"Q. Yes. * * *

"Q. State to the Court whether it is the identical premises involved in the Contract with Mr. Doran? A. Yes.

"Q. It is the identical one? A. Yes, sir; the same land.

"Q. Did you and Mr. Combs look over this land together? A. Yes, sir.

"Q. And was Mr. Doran out there at the time? A. Not that I seen.

"Q. What was the purchase price of the land? A. With Mr. Combs?

"Q. Yes. A. It was $45.00 an acre. * * * A. Well, after we made the agreement and signed it and made the contract for Deed he come out and started in rocking out there on that 640 acres.

"Q. Did he ever come to you and show you a notice from Mr. Doran? A. Yes; after he was out there working Doran came out and told him to get off the place and he come and wanted to know what move to make.

"Q. Can you fix the time when that occurred, when Mr. Combs talked to you? A. I would say it would be around the 18th of September or the 23rd—somewhere in the middle of September.

"Q. And that would be 1951? A. That is right; 1951."

The witness John M. Combs, in part, testified:

"Q. The Contract for Deed that you made with Mr. Tomsheck, what was the price per acre? A. $45.00 per acre. * * *

"Q. Did you pay any money down? A. No, sir. * * *

"Q. Do you know whether this is the land involved in the Contract for Deed with Mr. Doran? A. Yes, sir. * * *

"Q. Did you then go into possession of the land involved in this contract after August 23, 1951? A. Yes, sir.

"Q. And did you perform any work out there? A. Yes, sir.

"Q. What did you do? A. Done some rocking, off-set discing.
* * *

"Q. Were you able to observe that there had been some rocking done? A. Yes.

"Q. There had been a crop put in? A. Yes."

On motion of defendant's counsel made when plaintiff had rested his case in chief, a judgment of non-suit was given and entered.

This is an appeal by the plaintiff Tomsheck from such judgment.

The plaintiff assigns as error the entry of the judgment and the rejection of various offers of proof.

The plaintiff offered to prove what he claims to be the custom and practice prevailing in drafting and entering into contracts for deed or for the sale of agricultural lands. He also offered to prove by oral testimony that the contract of sale and the employment agreement were part and parcel of the same transaction.

The contract with Doran for the sale to him of the land is much too elaborate to be incorporated in full herein, but it clearly and convincingly speaks for itself as does the written employment agreement upon which plaintiff relied, neither of which refers to the other.

The testimony of plaintiff's witnesses fails to show any default or breach by Doran of the terms of the contract for the sale of the 640 acres of described lands. However, plaintiff's evidence does show complete failure on the part of plaintiff to comply with the specific provisions set forth in paragraph 5 of the contract of sale, prescribing the causes, manner and method for terminating the contract, being as follows:

"5. And in case of the failure of the said Party of the Second Part to make either of the payments, or interest thereon, or any part thereof, as is herein mentioned, or perform any of the covenants on his part hereby made and entered into, then the whole of said payments and interest shall, at the election of the Party of the First Part become immediately due and pay-

able, and this Contract shall, at the option of the Party of the First Part, be forfeited and determined by giving to said Second Party one year in writing, notice of his intention to cancel and determine this Contract, setting forth in said Notice the amount due upon said Contract, and the time and place, when and where, payment can be made by Party of Second Part.

"It is mutually agreed and understood by and between the Parties hereto that one year is a reasonable and sufficient Notice to be so given to said Second Party, in case of his failure to perform any of the covenants on his part hereby made and entered into, and shall be sufficient to cancel all obligations hereunto on the part of said First Party and to fully reinvest him with all right, title and interest hereby agreed to be conveyed * * *."

Here on one day, September 25, plaintiff gave notice that he "has rescinded the contract for deed" and on the next day, September 26, plaintiff commenced this suit. He did this without making any attempt whatever to comply with paragraph 5, supra, of the contract. He who comes into equity must come with clean hands.

In 12 Am. Jur., Contracts, sec. 434, at page 1015, it is said: "Where a contract gave a party thereto the right to terminate it in a certain contingency, he has no right to terminate it arbitrarily." Also see 12 Am. Jur., Contracts, sec. 448, p. 1030.

Oldfield v. Chevrolet Motor Co., 198 Iowa 20, 199 N. W. 161, 35 A. L. R. 889, with note at p. 893, holds that a notice of cancellation of a contract which does not comply with the requirements of the contract is without effect.

In 3 Black on Rescission and Cancellation of Contracts, 2d ed., sec. 572, p. 1409, it is said: "But when a particular form of notice, or *notice for a given length of time,* is stipulated for in the contract, exact compliance with it is necessary, and the giving of the prescribed notice is *absolutely an essential prerequisite* to the rescission or cancellation of the contract * * *" (Emphasis supplied.)

He who seeks equity must do equity. The plaintiff made no

608

█ case. He was and is entitled to no relief. By the terms of his contract with defendant, the plaintiff as first party, *inter alia*, agreed: That the crop or crops to be grown during the term of the contract "are to be delivered by the Party of the First Part to an elevator at time of combining, or as soon thereafter as conditions may permit"; that "Party of First Part shall deliver said second crop or crops to an elevator at or about the time of combining, and the said crop or crops shall be sold under the same agreement as is mentioned in the first paragraph" of the contract; that "Party of the First Part shall deliver said Third crop or crops to an elevator at or about the time of combining, or as soon thereafter as conditions may permit, and the Party of the Second Part shall have the right to sell said crop or crops when the market is deemed most favorable to both Parties hereto, and the said proceeds of said crop or crops shall be then credited as a Third payment upon this Contract" and that "Party of First Part agrees to furnish all farming machinery, fuel, oil, labor and repairs for the proper farming of this said acreage, during the period of this Contract."

Here, the plaintiff Tomsheck wrongfully and without complying with the terms of the contract gave notice that he was rescinding the contract and on the following day, September 26, 1951, plaintiff wrongfully and without right, commenced this groundless suit for rescission and, after suffering an adverse judgment, plaintiff on February 11, 1952, took an appeal to this court, which appeal, being wholly without merit, was doubtless designed to keep the defendant and those dealing with him in a state of uncertainty until the term originally fixed in the contract should expire.

The law does not permit plaintiff to thus take advantage of his own wrongs. Plaintiff may not fail to furnish and supply to the defendant the farming machinery, fuel, oil, labor and repairs for the proper farming of the land nor may plaintiff fail to perform his other obligations under the contract during the balance of the term covered thereby and then when the litigation is finally at an end, complain that the defendant has

breached his contract by failing to do that which the plaintiff's acts and conduct had rendered and made impossible for defendant to do.

Accordingly such default or failure to perform on the part of defendant as may have occurred from September 26, 1951, to the date of the issuance of the remittitur on this appeal shall not justify plaintiff in declaring the contract either forfeited or terminated, and the term of the contract shall not terminate until the expiration of two and one-half years from and after the date of the issuance of remittitur herein.

The trial court's rulings on the evidence and on plaintiff's offers of proof were correct. The judgment of nonsuit was properly given and entered. Such judgment is affirmed and the cause is remanded for further proceedings consistent with this opinion and for the entry of order or judgment declaring and adjudging time out for defendant's performance equal to the time consumed in this litigation from the filing of the complaint to the issuance of remittitur and allowing defendant two and one-half years from the date of the issuance of remittitur to perform except for breaches or defaults on the part of defendant occurring subsequent to the issuance of remittitur herein. It is so ordered.

ASSOCIATE JUSTICES BOTTOMLY, ANGSTMAN, FREEBOURN and ANDERSON, concur.