OLIN CORPORATION,
Plaintiff-Appellant-Cross
Appellee,

v.

CENTRAL INDUSTRIES, INC., Defendant-Appellee-Cross Appellant.

No. 76–2649.

United States Court of Appeals,
Fifth Circuit.

July 14, 1978.

George W. Rogers, Jr., Landman Teller, Vicksburg, Miss., for plaintiff-appellant-cross appellee.

Lee Davis Thames, Vicksburg, Miss., for defendant-appellee-cross appellant.

Before HILL, RUBIN and VANCE, Circuit Judges.

VANCE, Circuit Judge.

This appeal comes to us from the Southern District of Mississippi. Appellant, Olin Corporation, brought suit against Central Industries, Inc. seeking a declaration that Central had breached its agreement with Olin, asking that the agreement be declared

terminated and claiming damages for Central's alleged conversion of Olin's fertilizer. Jurisdiction was grounded on diversity of citizenship and the amount in controversy.

Central answered by a general denial. It counterclaimed seeking money damages for sums alleged to be owed to it by Olin and also seeking declaratory relief.

At the close of the case the trial judge gave a directed verdict for Central on all questions of liability under both Olin's claims and Central's counterclaim.[1] He submitted to the jury the question as to the amount of the recovery to which Central was entitled. The jury returned a verdict against Olin in the amount of $36,509.90. Both parties appealed. Olin challenges the correctness of the directed verdict and Central challenges the sufficiency of its amount.

In reviewing the sufficiency of the evidence in a diversity case we apply a federal rather than a state test. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969). *Boeing* also instructs us:

> [T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. *Boeing, supra* at 374.

The standard on appeal is the same as before the trial court. *Alman Brothers Farm & Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295 (5th Cir. 1971).

Olin manufactures fertilizer. It wanted to acquire the use of a fertilizer receiving, storage and handling facility in Vicksburg, Mississippi. Central was willing to provide, staff and manage such a facility, so on February 13, 1970 they entered into an agreement captioned "Operating and Storage Agreement and Agreement to Lease."

The agreement provided that Central was to acquire and equip a described facility and lease it to Olin for an initial term of ten years. In addition Central was to operate the facility, receiving fertilizer via barge, rail and truck, both in bulk and bagged, screening and bagging the bulk fertilizer in copyrighted bags furnished by Olin, storing it and loading it out for shipment to Olin's customers. Central agreed to fill each 50 pound bag[2] with that amount of the specified product, "with a tolerance in weight no greater than one-half pound per bag," and with one out of each hundred bags check weighed to the nearest ounce.[3] The contract specified the compensations to be paid Central with various adjustments, escalations and minimums. It also provided that Olin should retain title to all fertilizer until it was shipped or delivered out of the warehouse at Olin's instructions.

The testimony showed that in 1973 Olin received a few complaints of short weight fertilizer from the area served by the Central facility. Beginning in the spring of 1974, fertilizer was in critically short supply and the demand was very great. Olin's field representative, C. G. Clark, who serviced most of its customers in that area, began to receive widespread complaints

---

1. The district judge ruled in essence that whether or not the jury found Central to be misappropriating fertilizer, Olin could not rescind the contract because it had not complied with its termination clause.

2. The agreement also mentioned 80 pound sacks, but none were shown to have been utilized.

3. Section 4 of the agreement also states in part:
All bulk truckload shipments shall be weighed at loading out by CENTRAL personnel. All bulk outbound carload shipments shall be weighed at the local Vicksburg, Mississippi railroad yard. Any charges for said bulk carload shipment weighing shall be for the account of OLIN.

about short weights. As part of his initial investigation, he weighed bags which had been shipped by Central to various Olin dealers and found that although the bags were labeled as containing 50 pounds, "[Y]ou wouldn't have a bag that would come up to 50 pounds. In other words you've got a pattern of two, three, five, I weighed some as low as 35 pounds at Mize Co-Op and C. D. Ramsey, Jr. . . ." At Natchez Plantation Supply he weighed a number of bags and they were less than 50 pounds. "I don't think we ever had a bag that weighed 50 and a half pounds. It was less than 50 gross."

A number of Olin dealers who had received shipments from Central testified that they had been receiving short weights but had put up with it because of the then prevalent shortage. A dealer from Magnolia, Mississippi who had received an allotment of 800 tons of Olin fertilizer weighed one of his customers' trucks and found that it was 2,150 pounds short on a 20 ton purchase. As a result he spot checked his entire warehouse and found that out of 20 bags, each of them weighed from 46 to 48 pounds, including the bag, which weighs about three-quarters of a pound. A dealer from Mt. Olive, Mississippi purchased eight loads of fertilizer, each supposedly containing seven and one-half tons, which he picked up from Central. He found that he was short-weighted by about 1,000 pounds per load and verified the short weight by weighing the bags finding each of them to be about three to five pounds short. A dealer in Utica, Mississippi, who had purchased 15 truckloads of eight tons each which he received from the Central terminal, noticed that several of the bags were clearly underweight. As a consequence, he checked the weight of each bag on one of the loads and found them to average 47 pounds each.

A Hazelhurst dealer who died in May, 1974, had an allocation for that year of 50 tons which he picked up and disposed of early in the spring. Before his death he had approached Mr. Clark in an attempt to get additional fertilizer. Mr. Clark told him that he had already received all the Olin fertilizer that was available to him. The dealer pulled out a large roll of money and said, "[T]his says I can get a little fertilizer, I believe 20 tons, by this time tomorrow, in the morning." After the dealer's death, the Hazelhurst business was acquired by a successor owner whom Mr. Clark visited. During that visit, he observed Olin fertilizer in 50 pound bags being unloaded from a small truck. He then noticed about five to six tons of fertilizer stacked in the warehouse. He inquired of an employee as to the source of the fertilizer. Thereafter he and an Olin investigator visited the Bracken Farm,[4] where they noticed a pile of bulk fertilizer out in the yard. They also noticed a small building with filled Olin fertilizer bags stacked to the overhead. He and the investigator estimated that there was between 16 and 20 tons of fertilizer in the sheds if the bags were filled with fertilizer. On a subsequent visit they went inside a barn about 40 by 40 feet across and about 25 feet high. One side was almost full of Olin fertilizer bags stacked about ten feet high. They counted the bags as well as they could and estimated that there was 60 to 80 tons of fertilizer in that half of the barn if the bags contained fertilizer. As a consequence of their discovery they visited co-ops and distribution centers within a 75 mile radius of Hazelhurst, but could find no one who had sold fertilizer to "Pop" Bracken.

By deposition which was received into evidence, "Pop" Bracken admitted the presence of the bags as testified to by Olin's investigator, and also that there were four stalls in his large barn containing about 20 tons of fertilizer in each stall. He stated that the bags in the open shed contained only corn. He said that two of the stalls in the barn also contained corn. His explanation was that he had purchased fertilizer from a man named Heard at Gallman who had purchased it from the dealer in Hazelhurst. This was about 20 tons for which he

4. Central is owned by two Bracken brothers. They and a third brother, Parnell "Pop" Brack- en, owned the Bracken Farm which "Pop" Bracken managed.

claimed to have paid $2,400 in cash. He also claimed to have gotten some of the fertilizer, which was referred to as "scrapings," by picking it up off the ground where the rail cars were unloaded. He stated that he bagged that fertilizer himself. There was corroboration of "Pop" Bracken's testimony by Mr. Heard and by employees of Central.

At the conclusion of the plaintiff's case, the trial judge denied a motion for directed verdict stating that he would allow the jury to pass on it.[5] At the conclusion of all the evidence, he first indicated that he was going to give the charges requested by Olin. After an overnight recess, however, he reversed his decision and gave a directed verdict for Central.

■ Applying the *Boeing* test, we are clear to the conclusion that there was sufficient evidence from which reasonable jurors could have concluded that Central was engaged in the filling of Olin sacks with less than 50 pounds of Olin fertilizer, misappropriating the difference, and delivering short-weighted sacks to Olin's customers. Central urges, however, that the district court's ruling was correct as a matter of law in that even such a finding would not authorize termination of this particular contract.

■ Under the general rule, if a contracting party has committed a material

breach of contract the other parties should be excused from the obligation to perform further. *Williston on Contracts*, Third Edition, Section 864. This case, is of course, controlled by the substantive law of Mississippi. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In respect to this initial question Mississippi law clearly is in accord with the general law of contracts. As far as we can tell it has always been the rule in Mississippi that rescission is one of the remedies available to an injured party in the event of a material breach.[6] *Gulf South Capital Corp. v. Brown*, 183 So.2d 802 (Miss.1966); *Yazoo & M.V.R. Co. v. Baldwin*, 78 Miss. 57, 29 So. 763 (1900). In *Matheney v. McClain*, 248 Miss. 842, 161 So.2d 516, 519 (1964), Justice Rogers summarized the law of Mississippi as follows:

As a general rule, a party to a contract may break it, by renouncing his liabilities under it; by rendering performance of his promise impossible, or by totally or partially failing to perform his agreement or undertaking. When either party to a contract fails to perform any of his terms, the contract has been broken. See *McGraw v. Pulling*, Freem.Ch. 357. Moreover, if the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract, such a breach

**5.** The following comment was made by the district judge at the close of the plaintiff's evidence and in overruling Central's motion for a directed verdict:

There's a lot on both sides of this case that I certainly don't understand. I don't know whether the jury will or not, but of course if counsel is correct that he had a representative that was representing himself as a representative of Olin and if he says was stealing from him I don't think he's supposed to put up with that, and I don't know whether this man was stealing from him or not. I will let the jury pass on that. He had possession of some of the stuff out there that were, I think, extremely suggestive of the fact that he was stealing. Now whether he was or not I'm not saying because I don't have enough information before me to make that conclusion, but I certainly say that if this man were stealing under the circumstances and he was selling

material out there that's supposed to be 50 pounds and only 47 pounds in it and all that kind of stuff, I think he was an unfaithful employee and I certainly can understand why no company in the world would want him representing them in business down here.

**6.** Olin's complaint prayed for "termination." Williston says:

There are other words by which the result may be described, and whether a contract is spoken of as terminated, abrogated, annulled, avoided, discharged, or rescinded is not of itself important.

12 *Williston on Contracts*, Third Edition, Section 1454A, p. 10. There are historical differences of great importance and, indeed, important current distinctions in some jurisdictions under varying circumstances. Under the present circumstances, however, the *Williston* statement is accurate and applicable.

will discharge the other party from the performance of his promise. *McGraw v. Pulling,* supra; *Leek Milling Company v. Langford,* 81 Miss. 728, 33 So. 492; 17A C.J.S. Contracts § 474, p. 670.

*Gulf South, supra* at 805 further describes the type of breach that warrants termination as follows:

> [I]f there is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose.

■ In this instance Olin had contracted with Central in order to facilitate the distribution of its product to its customers in the Vicksburg area as part of its overall marketing system. We have no difficulty in concluding that a course of conduct by Central consisting of systematic misappropriation of such product and the delivery of short-weighted sacks to Olin's customers would constitute such a breach.

■ A more troublesome problem is presented by the next issue. The agreement contained three termination provisions. The most significant provision is found in paragraph 21(e) as follows:

> (e) If default shall be made by either party in the performance or compliance with any of the convenants, agreements, terms or conditions of this Agreement and such default shall continue for a period of ninety (90) days after written notice thereof by the party not in default to the other, then this Agreement may be terminated at the option of the party not in default upon written notice, within one hundred twenty (120) days of the date of default, to the other party . . . .

Both counsel advise us that there is no Mississippi case deciding whether inclusion of such a contractual provision thereby establishes the exclusive means of termination. We also have been unable to locate Mississippi authority. In such situations, "[T]he Court must ascertain for itself what would be the declaration of the State law by the State Courts in such a situation as confronts it." *Linkenhoger v. Owens,* 181 F.2d 97, 99 (5th Cir. 1950). In so doing we must determine as best we can and then apply what we think the state courts would do. *Kirby Lumber Corp. v. Laird,* 231 F.2d 812 (5th Cir. 1956). See also *Smoot, Jr. v. State Farm Automobile Insurance Co.,* 299 F.2d 525 (5th Cir. 1962). The situation is complicated by the existence of two well established and conflicting lines of authority from other jurisdictions.

What we will refer to as the *Corbin* view [7] is that where such a termination provision is included in a contract, it constitutes the exclusive means of terminating the contract. *Northwest Water Corp. v. City of Westminster,* 164 Colo. 61, 432 P.2d 757 (1967); *Johnson v. Kahrs,* 199 Ga. 365, 34 S.E.2d 503 (1945); *Tomsheck v. Doran,* 126 Mont. 598, 256 P.2d 538 (1953).

What we will refer to as the *Williston* view [8] is set forth in *Foster-Porter Enterprises, Inc. v. De Mare,* 198 Md. 20, 81 A.2d 325, 333 (1951) as follows:

> Plaintiff contends that the contract could be terminated only in accordance with the provisions of section 10 and, therefore, under paragraph (a), after ten days' notice "specifying the nature of the default". It seems, but is not clear, that Judge Moser took this view. Defendants contend that section 10 does not apply to the kind of breach alleged. We do not fully agree with either contention. *Unless a contract provision for termination for breach is in terms exclusive, Bartol v. Gottlieb-Bauernschmidt-Straus Brewing Company,* 129 Md. 32, 98 A. 286, *it is a cumulative remedy and does not bar the ordinary remedy of termination for "a breach which is material, or which goes to the root of the matter or essence of the contract".* Williston, Sec. 842; cf. *Keystone Engineering Company v. Sutter,* 196 Md. 620, 78 A.2d 191, 195. Section 10 is similar to usual default provisions in bond mortgages and other instruments

---

7. See: 6 *Corbin, Contracts* § 1266 at 64 (1962).

8. This view is found in *Williston on Contracts,* Third Edition, § 842, fn. 1 at 165.

under which securities are issued. Such default provisions ordinarily are cumulative, not exclusive, *Chicago, Danville & Vincennes R. Co. v. Fosdick*, 106 U.S. 47, 68, 1 S.Ct. 10, 27 L.Ed. 47, and when in terms exclusive, are strictly construed. *Guaranty Trust and Safe Deposit Company v. Green Cove Springs & Melrose Railroad Co.*, 139 U.S. 137, 141–142, 11 S.Ct. 512, 35 L.Ed. 116. If plaintiff had committed a material breach of his contract, Foster-Porter could have terminated the contract without regard to the provisions of section 10. Under section 10 the contract could be terminated for a breach of obligation which did not amount to a material breach. (Emphasis added)

The *Williston* rule also finds support in *Young Travelers Day Camps, Inc. v. Felsen*, 118 N.J.Super. 304, 287 A.2d 231 (1972) and in *Lyon v. Pollard*, 87 U.S. (20 Wall.) 403, 22 L.Ed. 361 (1874).

The case of *Light, Heat & Water Co. v. City of Jackson*, 73 Miss. 598, 19 So. 771 (1895) presents a somewhat comparable but factually distinguishable situation. The city and the company had entered into a contract in which the city had agreed to take water and provide hydrant rent for a period of 20 years. Section 11 of the contract provided that all hydrants would be supplied with water and kept in good repair. It also provided that if the hydrant was not fixed in six days after notice, the company was to forfeit to the city ten dollars per week for each week each of such hydrants was out of repair. The city filed a bill to rescind the contract because of several claimed deficiencies in the company's compliance with its requirements. The Supreme Court of Mississippi held with respect to Section 11 that:

> [It] was not in the nature of liquidated damages for the entire breach of the contract, but a penalty for the occasional and temporary neglect on the part of the company to keep all or any of the hydrants in proper repair. . . . The breach of contract for which rescission should be decreed must be one, not occasional and immaterial only, but one going to the very substance of the contract. *Light, Heat & Water Co. v. City of Jackson, supra*, 19 So. at 774.

Another aspect of the problem was, we think, correctly discussed in *United States v. Stevens Enterprises, Inc.*, 183 F.Supp. 411, 413 (S.D.Miss.1960) where the court stated:

> It is beyond dispute that when a party to a contract knowingly and wilfully fails in his performance, he is indeed occupying an untenable position when he complains that the other party to the contract has injured him by exercising the power of termination.

Taking into account the Mississippi rule that a material breach ordinarily justifies rescission and the policy of Mississippi statutes requiring good faith and honesty in dealing,[9] together with such other indications that we have of the policy of the Mississippi law in the general area of the problem presented, we feel that the initial decision of the trial judge was correct and that he erred when he reversed that decision and gave a directed verdict. We adopt the *Williston* view as the rule that we feel would most likely be embraced by the courts of Mississippi. In so doing we hold that the termination provision in the Olin-Central agreement did not provide the exclusive means of termination in the event of a material breach which had the effect of substantially defeating the purpose of the contract. It follows that the right of Olin to terminate the contract should have been submitted to the jury.

---

**9.** Some insight into the policy of the law of Mississippi may be gained from its adoption of the Uniform Commercial Code, effective in that state on March 31, 1968. *Mississippi Code 1972 Annotated*, Tit. 75, § 1–203 provides that: "Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement." "Good faith" is defined as honesty in fact in the conduct or transaction concerned, § 1–201(19). In other circumstances the Supreme Court of Mississippi has cited with approval the section in *Corpus Juris* wherein it is stated: "Every contract implies good faith and fair dealing between the parties to it." See: *Darden v. American Bank and Trust Co.*, 158 Miss. 742, 130 So. 507 (1930) citing 13 C.J. p. 540.

Because the issue of liability was taken from the jury it is necessary that we reverse the entire judgment. In the interest of judicial economy, however, we consider the additional questions presented by Central's cross appeal which are likely to recur on retrial of the case following remand.

■ Sections 8 and 22 of the agreement between Olin and Central called for both a guaranteed annual payment and a monthly warehouse rent. Olin admitted that it had not made payments as called for both before and after it undertook to rescind. The agreement contains a broad *force majeure* provision excusing either party for nonperformance caused by acts of God. The evidence reveals that a flood on the Mississippi River interfered with Central's operations for three months during a critical season. We think that the trial judge correctly submitted to the jury the fact question as to whether the annual guarantee during one of the contract years should be reduced by reason of the 1973 flood.

■ Central complains that the trial judge erred in instructing the jury that Olin was entitled to a reduction in the amounts owed Central equal to Central's receipts from a successor to Olin. Under Mississippi contract law any circumstance which mitigates the damages sustained from a breach of contract is considered in measuring damages. "The party subject to injury from a breach of contract is under obligation to make a reasonable exertion to reduce his damages as much as practicable." *Vicksburg & Meridian R.R. Co. v. L. A. Ragsdale*, 46 Miss. 458, 482 (1872). Mississippi seems to hold that a landlord need not accept or procure new tenants during the unexpired term of a lease in order to mitigate damages. See, *e. g., Alsup v. Banks*, 68 Miss. 664, 9 So. 895 (1891); and generally, 21 A.L.R. 3rd 534, *Damages-Mitigation by Landlord*, § 3(A) p. 546. If he undertakes to let the premises, however, the landlord is required to apply any monies received to the fulfillment of the original lessee's obligation under the lease. *Alsup v. Banks, supra*. It would follow from this rule that the trial judge incorrectly instructed the jury: "Central Industries, once Olin vacated the premises, had the obligation to attempt to realize revenue from others . . . ." Such instruction, however, was free of harmful error. In fact, Central did attempt to relet the premises and succeeded in doing so. Our rule is that, "In reviewing the trial court's instructions to the jury, we must consider the charge as a whole. There is no harmful error if the charge in general correctly instructs, even if one portion is technically incorrect. . ." *Houston v. Herring*, 562 F.2d 347, 348 (5th Cir. 1977).

■ Central insists that Olin was not entitled to any instruction concerning mitigation because the evidence shows that it sustained a net loss in connection with the rerenting of the warehouse. Under Mississippi law an injured party is entitled to a credit for all legitimate expenses incurred by him in attempting to reduce his damages. *Vining v. Smith*, 213 Miss. 850, 58 So.2d 34 (1952). The evidence shows that Central entered into arrangement with Swift Chemical Company after Olin vacated its warehouse.[10] Under the arrangement with Swift it had received $65,764.24 in revenue by early 1976. During the same period its expenses exceeded that amount so that without counting depreciation it had sustained a net loss of "about $24,000."

The fallacy in Central's position is that its evidence does not differentiate between expenses incurred by it in its effort to minimize loss and other unrelated expenses as well as ordinary fixed expenses which would have been incurred by it whether Olin did or did not terminate. Stated otherwise, there was no showing by Central as to the amount, if any, by which its expenses were increased above or were different from what they would have been had Olin

---

10. The evidence suggests but does not clearly show that the Swift arrangement may have operated in a manner somewhat similar to the Olin arrangement. Our indication that it was merely a reletting of the premises is not precisely correct. The controlling principle would not be affected, however, by our and the record's lack of precision in this respect.

not terminated. From aught that appears Central was $65,764.24 better off from having relet the premises to Swift. Under that state of the evidence the trial court's instruction is not subject to the criticism advanced.

 Central complains of error in the instruction that the jury should reduce the award to Central by the amount of any fertilizer diverted by Central. It argues that absent proof of a refund to its customers Olin has not shown any compensable loss. The argument misses the controlling point. Under the agreement of the parties Olin retained ownership of the fertilizer while it was being handled by Central. If it proves that Central converted such fertilizer Olin is entitled to recover damages for such conversion. Whether Olin does or does not adjust the prices paid by its short weighted customers is not controlling. Under Mississippi law, the measure of its damages for conversion is the value of the fertilizer at the time of conversion with interest thereon to the time of trial. *Ingram Day Lumber Co. v. Robertson,* 129 Miss. 365, 92 So. 289 (1922). Damages for conversion is one of the enumerated claims in Olin's complaint. The evidence in the record before us is probably deficient with respect to proof of value. In addition, at the prior trial Olin did not make a serious attempt to prove the total amount of the fertilizer which had been converted (although its proof would doubtless support a finding with respect to some amount). If on retrial the jury finds that Central did convert Olin's fertilizer, Olin would be entitled to recover damages to the extent proved. There is no error in the giving of an instruction to this effect.

 The court also instructed the jury that it could reduce the amount due Central by the amount of damage to Olin's business reputation. The record before us discloses that such item of damage was not claimed by Olin in any pleading, that it was not mentioned in any pretrial order and that

there was no proof whatever as to any amount. The amount of actual damages must be proved. They cannot be based on mere conjecture or speculation. *Nat Harrison Associates, Inc. v. Gulf States Utilities Co.,* 491 F.2d 578 (5th Cir. 1974). Without either supporting allegation or proof such an instruction was error.

REVERSED and REMANDED.