# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2015

Lyle W. Cayce
Clerk

No. 13-20744

JAMES L. HENRY,

Plaintiff - Appellee Cross-Appellant

HOMER RANDLE,

Plaintiff - Appellee

v.

CORPCAR SERVICES HOUSTON, LIMITED, doing business as Carey of Houston; CORPCAR SERVICES HOUSTON C.L., LIMITED,

Defendants - Appellants Cross-Appellees

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-2417

Before DAVIS, WIENER, and HAYNES, Circuit Judges.

PER CURIAM:*

A jury found for Plaintiffs James Henry and Homer Randle on their Title VII hostile work environment claims against their former employer CorpCar Services of Houston, Ltd. ("CorpCar"). The jury also found for Henry on his Title VII retaliation claim against CorpCar. CorpCar appeals the district

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-20744

court's denial of its motion for judgment as a matter of law. Henry cross-appeals the amount of attorney's fees awarded. We AFFIRM in part and REMAND for further proceedings consistent herewith.

## I. Factual Background

CorpCar is a limousine service company in Houston, Texas. The Plaintiffs are African-American former employees of CorpCar. CorpCar employed Randle as a chauffeur and Henry as a chauffeur and trainer.

In the spring of 2009, various African-American CorpCar employees asked for time off for June 19th, known as "Emancipation Day" or "Juneteenth"—a holiday officially recognized by the State of Texas that commemorates the 1865 announcement in Texas of the abolition of slavery. Tex. Gov't Code 662.003(b)(4). Approximately 75% of CorpCar's chauffeurs were African-American, and in prior years, many employees had asked for time off for Juneteenth. For the 2009 Juneteenth, Henry asked general manager Andy Vanhaverbeke, assistant general manager Stan Alcott, and the dispatch department not to schedule him for runs so he could attend various events and speaking engagements. Henry discussed with Vanhaverbeke in particular the significance of Juneteenth.

CorpCar scheduled multiple safety meetings for June 18th, 19th, and 20th and required their employees to attend at least one of the meetings. Some of CorpCar's employees expressed disappointment at the scheduling of the meetings on and around the Juneteenth holiday. Christopher Wolfington, CorpCar's CEO, hired a singing telegram to perform, in costume, at the mandatory meetings.

Plaintiffs Henry and Randle attended the June 18th meeting, as did Wolfington, Vanhaverbeke, and Alcott. To the surprise of the employees in attendance, a white woman in a black gorilla suit entered the meeting. The door was closed behind her and Alcott stood as if to guard the exit. The woman

2

in the gorilla suit sang, danced, touched employees, and sat in their laps. She did Tarzan yells and repeatedly referred in a suggestive manner to "big black lips," "big black butt," and bananas. This went on for approximately ten minutes. Wolfington, Vanhaverbeke, and Alcott were all seen laughing, and a CorpCar employee videoed the performance, later posting it online to YouTube.

The woman in the gorilla suit specifically directed part of her performance at Henry. She called him by name and started approaching him while Vanhaverbeke, who was also videoing with his cell phone, leaned in to Henry and stated, "Okay. Here's your Juneteenth." The performer then said to Henry, "James, are you ready for this? Here's your Juneteenth. Oh, these nice big black hairy lips. Don't you want some? Oh, that nice banana in your pants. You could have worked for La Bare's. Oh, don't you want to make me scream."

While CorpCar had safety meetings in the past, performances were never before part of the meetings. Management explained that the gorilla performance was intended to raise morale and lighten the mood. Henry, Randle, and other African-American employees, however, were extremely offended, embarrassed, and angered by the performance, which coincided with Juneteenth. In light of the historical use of such imagery against African-Americans, they perceived the performance as CorpCar comparing them to gorillas. At trial, CorpCar management admitted that they were aware of African-Americans being compared to such primates and that such a comparison was racially offensive.

Immediately after the meeting, Randle confronted Alcott, stating, "[t]his is a very racist act that you have put upon us. Do you not realize that today is the celebration day leading into tomorrow for Juneteenth and freedom? Do you fully understand that? This is very racist. Why would you do this?" Henry also complained to Alcott that the performance was offensive, inappropriate,

unprofessional, and not funny.  Alcott told Henry, "You're a grown man.  Get over it."  Alcott relayed to Vanhaverbeke that some of the chauffeurs did not find the performance to be funny.  Alcott and Vanhaverbeke both testified that they did not recognize at that time that their employees found the performance to be *racially* offensive.

Henry also told dispatch-department employees about the performance.  A manager who was present said, "Did you enjoy it, your Juneteenth?"

The next day, Juneteenth, dispatch called Henry at 2:30 a.m. to assign him two special runs for that morning.  Henry informed dispatch that he had requested to be off for the day, but they told him he was required to report to work at 7:00 a.m. to complete the runs.  Henry arrived at work at 6:45 a.m. and waited over two and a half hours before he was assigned a run.  Dispatch claimed that his first run had been cancelled.  While he waited, dispatch asked him to open the front gate for a car.  The gate was an automatic gate that dispatch normally operated themselves, but, according to dispatch, it was stuck.  Henry did as requested, only to find he had opened the gate for the same woman in the gorilla suit.  She said, "James, I'm here for you again.  This is your big black woman. You need her.  Here's—come scratch on my little hairy butt for me."

The woman in the gorilla suit went on to perform at three more of the safety meetings.  Wolfington explained at trial that the later performances were "better" and "funnier."

Henry met with Alcott again briefly on Juneteenth, expressing disbelief that the performer had returned.  Alcott told Henry to "get over it."  In the months after the events of Juneteenth, Henry continued to voice complaints to Alcott and Vanhaverbeke about the gorilla incidents.  CorpCar management generally ignored his concerns.

For the months following the Juneteenth incident, Henry's weekly

No. 13-20744

earnings averaged out to $100 less per week than he was earning for those months prior to the Juneteenth incident. Henry attributes this decrease to dispatch and management retaliating against him for complaining about the gorilla incidents by assigning him fewer and less valuable runs. However, there was testimony that this reduction in earnings was attributable to an annual slowdown in the demand for limousine services that occurred during July and August. Indeed, out of CorpCar's top ten chauffeurs based on average hours per week, seven experienced a decrease in average hours during this period. Three experienced a greater decrease in average hours than Henry. Both before and after the Juneteenth incidents, Henry ranked second in the company in terms of total revenue.

Sometime after the Juneteenth incidents, Henry performed six training sessions for new chauffeurs, for which he was to be paid $100 a session. Henry was never paid for these sessions, and Alcott said this was because he did not know how to enter it into the accounting system. Henry believed this was in retaliation for him complaining about the gorilla incidents. Henry also believed that dispatch and management retaliated against him by assigning him odd hours, with longer spans of times between runs, such that he was not able to get more than a few hours of sleep each night. As a result, Henry grew increasingly unable to work at CorpCar and he ultimately resigned in October 2009.

## II. Procedural Posture

The Plaintiffs filed suit against CorpCar alleging a racially hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964. After a three-day trial, the jury returned a verdict in favor of Henry and Randle finding that: (1) the Plaintiffs were subjected to a hostile work environment because of their race; (2) the defendants knew or should have known that the offending conduct was racial harassment; (3) the defendants took an adverse

No. 13-20744

employment action against Henry; and, (4) both Plaintiffs should recover damages against the defendants. The jury awarded Henry $600 in back pay and $50,000 in compensatory damages and Randle $12,500 in compensatory damages. The jury awarded punitive damages of $90,000 to Henry and $10,000 to Randle. The district court reduced Henry's damage award to $50,000 pursuant to 42 U.S.C. § 1981a(b)(3)(A).

The Plaintiffs filed motions requesting attorney's fees and costs. The district court granted Henry's motion in part, awarding him $54,648 in attorney's fees and $3,480 in costs. The district court granted Randle's motion in full, awarding him $74,950 in attorney's fees and $366 in costs. CorpCar filed a motion for judgment as a matter of law and, in the alternative, for a new trial. The district court denied CorpCar's motion and entered final judgment. CorpCar timely appealed the denial of its motion for judgment as a matter of law or for a new trial. Henry cross-appealed as to the district court's determination of attorney's fees and costs.

## III. Discussion

We review the denial of a motion for judgment as a matter of law de novo. *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc). Judgment as a matter of law is proper when "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* at 451 (citation and internal quotation marks omitted). We must draw all reasonable inferences in the light most favorable to the verdict and "cannot reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Id.* at 452 (citation and internal quotation marks omitted). "However, we will not sustain a jury verdict based only on a mere scintilla of evidence." *SMI Owen Steel Co. v.*

*Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (citation and internal quotation marks omitted).

We review the denial of a motion for a new trial for clear abuse of discretion. *Travelers Cas. & Sur. Co. v. Ernst & Young LLP*, 542 F.3d 475, 482 (5th Cir. 2008). "Because '[o]ur review of the district court's denial of a motion for a new trial is more deferential than our review of a motion for judgment as a matter of law,' any such challenge is subsumed in our analysis of the denial of a motion for judgment as a matter of law." *Wackman v. Rubsamen*, 602 F.3d 391, 399 (5th Cir. 2010) (quoting *Travelers Cas.*, 542 F.3d at 482).[1]

## A.  Hostile Work Environment

The creation of a hostile work environment is a proscribed form of discrimination under Title VII. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).  A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citation and internal quotation marks omitted).  To ensure that Title VII does not become a "general civility code," only "extreme" conduct will be found sufficiently severe or pervasive: "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted).  We evaluate the severity of harassment by considering whether a reasonable person in the plaintiff's position would find the work environment hostile or abusive. *See Oncale v.*

---

[1] Because our conclusions on the motion for judgment as a matter of law adequately dispose of all of CorpCar's issues, we do not separately address its arguments for a new trial. *See Smith v. Xerox Corp.*, 602 F.3d 320, 336 n.64 (5th Cir. 2010), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

*Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998); *Boh Bros.*, 731 F.3d at 453.[2] We are to consider "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787–88 (quoting *Harris*, 510 U.S. at 23). This totality-of-the-circumstances inquiry relies on "[c]ommon sense[] and an appropriate sensitivity to social context." *Oncale*, 523 U.S. at 82.

CorpCar challenges the jury's verdict on the ground that the conduct at issue was not sufficiently severe or pervasive. Because the incidents in this case primarily occurred over two days, CorpCar emphasizes the lack of frequency. Nonetheless, it is well established that "[u]nder the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim." *EEOC v. WC&M Enters.*, 496 F.3d 393, 400 (5th Cir. 2007); *see Faragher*, 524 U.S. at 788 (implying that an isolated incident, if "extremely serious," can produce a hostile work environment); *Harris*, 510 U.S. at 21 (hostile work environment involves "severe *or* pervasive" conduct (emphasis added) (citation and internal quotation marks omitted)); *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007) ("An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment."); *Harvill v. Westward Commc'n, L.L.C.*, 433 F.3d 428, 434–35 (5th Cir. 2005) (explaining that conduct need not be both severe *and* pervasive to be actionable under Title VII); *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 483 (5th Cir. 2002) (same). Construing the

---

[2] The Plaintiff must also subjectively find the conduct hostile or abusive. *See Faragher,* 524 U.S. at 787. There is no dispute that this requirement is met in this case.

evidence in the light most favorable to the verdict, we hold that the conduct occurring here was sufficiently severe to constitute actionable discrimination, despite its brief tenure.

The jury could easily find from the evidence that CorpCar was pejoratively comparing its African-American employees to gorillas: African-Americans have historically been subjected to such comparisons; the woman in the gorilla suit repeatedly emphasized the "black" aspects of her gorilla suit; management scheduled the performances on and around Juneteenth even though they were aware of its significance to African-Americans; and statements such as "Here's your Juneteenth" were made by Vanhaverbeke, the woman in the gorilla suit, and another manager. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) ("'Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that' the use of monkey imagery is intended as a 'racial insult' where no benign explanation for the imagery appears." (quoting *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998))). "'To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the mere unflattering; it is degrading and humiliating in the extreme.'" *Green v. Franklin Nat'l Bank*, 459 F.3d 903, 911 (8th Cir. 2006) (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004)).

Consequently, courts have repeatedly found that intentionally comparing African-Americans to apes is highly offensive such that it contributes to a hostile work environment. *See, e.g.*, *Allen v. Potter*, 152 F. App'x 379, 382–83 (5th Cir. 2005) (unpublished) (offensive comments such as "Look at the monkeys" and "Don't feed the Monkeys," along with other animal comparisons, raised genuine issue of fact as to severity or pervasiveness); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (triable issue raised

with regard to hostile work environment where, inter alia, supervisors verbally assailed African-American employees with physically humiliating comparisons to monkeys), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006); *see also Jones*, 683 F.3d at 1300–01 (repeated appearance of banana peels on employee's truck); *Green*, 459 F.3d at 911 (employee called a monkey); *Webb v. Worldwide Flight Serv., Inc.*, 407 F.3d 1192, 1193–94 & n.3 (11th Cir. 2005) (same); *White*, 375 F.3d at 298 (same); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) (African-Americans described as monkeys); *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906, 910, 924 (7th Cir. 1991) (same).

Considering "all the circumstances," we cannot avoid observing that the gorilla comparison in this case went well beyond "a mere offensive utterance." *Harris*, 510 U.S. at 23. Indeed, the caricature that occurred in this case went beyond most any other intentional and offensive ape or monkey comparison that we have found in the case law. It took the form of an extended charade involving a woman in a black gorilla costume, which CorpCar management paid for and required employees to attend. At the meeting that Henry and Randle attended, management guarded the door, videoed, and emphasized the comparison by stating, "Here's your Juneteenth." Moreover, the evidence gives rise to an inference that this performance was scheduled to coincide with and mock the Juneteenth holiday on which African-Americans in Texas celebrate freedom from slavery. A mandatory, dramatic performance mocking freedom from slavery for African-Americans in this country is exceedingly offensive and egregious. Considering the conduct in light of the "social context," *Oncale*, 523 U.S. at 82, the severity of the harassment is apparent.

Another factor demonstrating severity is the physically humiliating nature of the incidents. *See Harris*, 510 U.S. at 23; *La Day*, 302 F.3d at 482 (finding conduct to be "physically 'humiliating'; even if not 'threatening'"). The

woman in the gorilla suit touched employees and sat in their laps while making comments that were both sexually suggestive and racially degrading. To Henry in particular she stated, "Oh, that nice banana in your pants. You could have worked for La Bare's. Oh, don't you want to make me scream." The jury was entitled to find that the overarching theme of the performance was that the African-American employees' physical features were akin to those of a gorilla.

The jury could also find that the incidents unreasonably interfered with the employees' work performance. *Harris*, 510 U.S. at 23. "Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22. At trial, there was testimony that the Plaintiffs were unable to focus on and retain the information that was passed on during the safety meeting because they were reeling from what had just occurred. Randle's immediate reaction was to confront management. Thereafter, he became angry, withdrawn, uninvolved, and isolated. Henry suffered from severe anxiety, depression, anger, and nervousness, and sought professional counseling. Partially because of the harassment, Henry resigned from CorpCar a few months later.

All in all, of the factors to be considered, the only one not weighing in favor of the verdict is frequency. This is but one factor to be considered, and "no single factor is required." *Id.* at 23. Even so, this factor does not weigh sufficiently strongly to set aside the verdict. This was not a solitary occurrence: CorpCar brought the woman in the gorilla suit back to perform at three more meetings on Juneteenth even after Henry and Randle complained. Henry was also required to come in on Juneteenth, after he had been given the day off,

apparently to open the gate for the woman in the gorilla suit. During this second incident, he endured further racially offensive comments.

Having considered the totality of the circumstances in the light most favorable to the jury's verdict, we cannot conclude that the facts and inferences point so strongly and overwhelmingly in CorpCar's favor that reasonable jurors would be unable to reach a contrary conclusion. *See Boh Bros.*, 731 F.3d at 451. Our conclusion is supported by cases of this court that have found similarly egregious incidents to be sufficiently severe or pervasive despite their brief duration. *E.g.*, *Schexnayder v. Bonfiglio*, 167 F. App'x 364, 366 (5th Cir. 2006) (unpublished) (finding upper management's repeated improper sexual advances over the course of two days supported jury's verdict); *Allen*, 152 F. App'x at 382–83 (finding that employees raised genuine issues of fact as to severity or pervasiveness when they were required to work in a cage for one and one half hours and coworkers threw peanuts and bananas at them and placed a sign on the cage that read, "Do not feed the animals."); *La Day*, 302 F.3d at 476, 482–83 (finding sufficient summary judgment evidence of severity or pervasiveness from three brief incidents of sexually offensive conduct, with two incidents occurring on the same day).[3] We thus affirm the district court's denial of CorpCar's motion for judgment as a matter of law and new trial as it pertains to the jury's finding that the Plaintiffs were subjected to a hostile work environment.

*B. Punitive Damages*

Proving punitive damages presents "a higher standard than the showing necessary for compensatory damages, satisfied in 'only a subset of cases

---

[3] Although *Schexnayder* and *Allen* are not "controlling precedent," we cite them for their "persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

involving intentional discrimination.'" *Boh Bros.*, 731 F.3d at 467 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)).   Under Title VII, punitive damages are recoverable only if the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to [an employee's] federally protected rights."   42 U.S.C. § 1981a(b)(1).   "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."   *Kolstad*, 527 U.S. at 535.   Malice has been described as "evil motive or intent," and reckless indifference has been described as "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'"   *Id.* at 536 (quoting *Smith v. Wade*, 461 U.S. 30, 37 n.6, 41, 56 (1983)).   "Pointing to evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to 'demonstrate' that the employer acted with the requisite 'malice or . . . reckless indifference,'" but "an employer's conduct need not be independently 'egregious' to satisfy §1981a's requirements for punitive damages award."   *Id.* at 539, 546 (quoting 42 U.S.C. § 1981a(b)(1)).

At the conclusion of trial, the district court instructed the jury on the above standards with the following;

> If you find that [CorpCar] is liable for the injuries of the plaintiff in question, you may also award punitive damages if the plaintiff in question has proved by clear and convincing evidence that [CorpCar] acted with malice or reckless indifference to the plaintiff's right not to be subjected to racial harassment or discrimination . . . . An action is taken with malice if a person knows that it violates federal law prohibiting discrimination and does it anyway.   An action is taken with reckless indifference if with knowledge that certain conduct violates the law, fails to take curative action . . . . If you determine that [CorpCar's] conduct was so shocking and offensive as to justify an award of punitive damages, you may exercise your discretion to award those damages.

No. 13-20744

In reviewing the record in the light most favorable to the verdict, we are satisfied that the jury could reasonably infer that CorpCar's "conduct was so shocking and offensive as to justify an award of punitive damages." As to malice, the record reflects that CorpCar, through its representatives, acted with "evil motive or intent." *Id.* at 536. CorpCar hired a white female to dress as a gorilla to perform at mandatory meetings the day before, and on, Juneteenth. At trial, Henry described the events at the meeting as follows:

> As we got into the meeting, they shut the door. Later, a lady came in dressed in a black ape costume very -- out of disorder. She come in. They shut the door, kind of guarded the door. She starts singing, dancing, touching on people, sitting in their laps, making racial slurs. And, for some apparent reason, she knew my name, and that kind of infuriated me. Mr. [Vanhaverbeke] quickly, when he saw that I was upset, moved to my left and got in close to me. And he had his iPhone out. I was like, "Why is he filming all this?" And he kind of leaned over to me and he said, "Okay. Here's your Juneteenth." The lady come over also and said, "James, are you ready for this? Here's your Juneteenth." And she began to start singing and making slurs like, "Oh, these nice big black hairy lips. Don't you want some? Oh, that nice banana in your pants," you know. "You could have worked for La Bare's," you know. "Oh," you know, "don't you want to make me scream," you know, just all provocative, sexual overtone. When they noticed that I was getting upset, they kind of moved their positions around; but they were – still had this smirk on their face. And I kind of looked at Mr. Wolfington, then I looked at Mr. [Vanhaverbeke]. . . . [W]hen I looked at the door, how it was guarded, I looked at the upper management, you really just felt helpless.

One of the employees videotaped a portion of the performance and put it on YouTube. The employee told CorpCar management he had taken that action, and at the time of trial management had taken no steps to remove this graphic record of the events causing Plaintiffs' such embarrassment and humiliation as the object of their employer's offensive racial joke.

14

After the meeting, Henry approached Alcott, his immediate supervisor, and complained that he was racially offended by the comparison of African-Americans to gorillas and the mocking of the significance of Juneteenth. He told Alcott, "I do not like to be portrayed as an ape. Because I'm wearing a black suit, do I look like an ape? Is that why you gave me the chauffeur cap so I'll have a complete ape suit?" Alcott replied, "Get over it." Henry then proceeded to the dispatch office where he ran into another CorpCar manager. This manager turned to Henry and said, "Did you enjoy it, your Juneteenth?" Henry then approached Vanhaverbeke and said, "Mr. Andy, I need to talk to you about this gorilla situation. It's not funny." Vanhaverbeke "kind of smirked and turned and went back into his office."

Henry had specifically asked, and was approved, to be off from work the next day, Juneteenth, in order to speak at several celebration events. Notwithstanding that prior approval, CorpCar called Henry into work and instructed him to manually open the "usually automatic" security gate for a vehicle. When Henry opened the gate, the occupant of the vehicle was the same gorilla performer. She said, "James, I'm here for you again. This is your big black woman. You need her. Here's - - come scratch on my little hairy butt for me."

Randle corroborated Henry's testimony on what occurred during the meeting. He then explained to the jury how he felt about the performance by stating:

> It's one thing to read about it. It's one thing to have watched Civil Rights videos, movies, testimonies. But to be put in that situation as an educated African-American or any person, education or not, and to be forced and subject to that type of humiliation, degradation, knowing that if you did not attend this meeting you would lose 100 percent of your income, and then for -- to have the company CEO sitting in there laughing, enjoying, it's -- I don't even -- I don't know if there are any words to express it.

Like Henry, Randle rushed to Alcott's office after the meeting. Once there, he got in Alcott's face — about two feet from him — and emphatically asked, "What was that?" He told Alcott "this was unprofessional, it was uncalled for in a corporate setting . . . . I'm offended. I'm pissed off. . . ." Alcott told Randle to come by the next day and they would talk about it. The next day, Alcott refused to meet with Randle because Alcott attended the next meeting with the same gorilla performance.

As stated before, the first mandatory, dramatic performance mocking African-Americans' freedom from slavery in this country was offensive and insulting in the extreme. CorpCar then brought the offensive gorilla-performance back the next day, Juneteenth, for three more performances similar in content. And this was after the Plaintiffs explained to the CorpCar managers how and why it was so offensive to them as African-Americans. Because of the egregious nature of CorpCar's conduct, we are satisfied that a reasonable jury could infer that CorpCar acted with the "evil intent" of making Plaintiffs and other African-American employees the butt of an extremely offensive racial slur and joke.

The evidence also supports a jury finding that CorpCar acted with reckless indifference to the Plaintiffs' rights. Wolfington, CorpCar's CEO, testified that he knew comparing African-Americans to apes or gorillas was racially offensive; yet, Wolfington hired the performer. Alcott also had extensive knowledge of the history of Juneteenth, its social significance to African Americans in Texas, and the offensive nature of comparing African-Americans to gorillas. Both company officials laughed and smirked during the performance and told Plaintiffs in a mocking manner, "Here's your Juneteenth." Any doubt about the officials' indifference towards the Plaintiffs' rights is removed when they brought the performer back for repeat

16

performances after Plaintiffs explained in detail how and why they were offended.  The jury could have readily inferred that Wolfington, Alcott, and Vahaverbeke subjectively understood that comparing African-Americans to gorillas at mandatory meetings near Juneteenth, violates federal law.  CorpCar, therefore, engaged in intentional discrimination with reckless indifference towards the rights of the Plaintiffs.  *See Rhines v. Salinas Constr. Techs, Ltd.*, 574 F. App'x 362, 364 n. 2 (5th Cir. 2014) (unpublished) (punitive damage award for hostile work environment claim was affirmed when supervisors called an employee "mayate," which is Spanish for "ni—er" or "monkey."); *cf. Baty v. Willamette Indus.*, 172 F.3d 1232, 1244-45 (10th Cir. 1999) (punitive damage award was affirmed for hostile work environment claim because management did not respond to plaintiff's complaints and management condoned the harassment.).

Accordingly, we affirm the award of punitive damages.

## C.  Attorney's Fees

Henry cross-appeals the district court's award of attorney's fees, arguing that the court committed clear error by not awarding Henry the full amount of attorney's fees requested after specifically finding that CorpCar's arguments in opposition lacked merit.  We agree with Henry that the district court's attorney's fees award lacks clarity as to the reasons for the award.  On remand, the district court should make a clarified attorney's fees determination as it pertains to Henry, "explain[ing] with a reasonable degree of specificity the findings and reasons upon which the award is based." *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996) (citation and internal quotation marks omitted).

## IV. Conclusion

We therefore AFFIRM the award of damages made to both Henry and

No. 13-20744

Randle under Title VII based on a hostile work environment.[4]   We also REMAND for further findings and proceedings if necessary on the attorney's fee award to Henry.

---

[4] The way this trial was structured and the way the verdict and judgment were rendered makes it unnecessary for us to consider CorpCar's challenge to the jury's finding of liability on Henry's retaliation claim.

The special verdict returned by the jury did not distinguish between damages due to Henry under his hostile work environment claim or his retaliation claim. For example, Henry's $50,000 compensatory damages award for pain and suffering was not distinguished between retaliation and the hostile work environment claim. Such distinction was not necessary because both claims were brought under Title VII and both allow recovery for the same elements of damage.  In its instructions, the court simply told the jury that it should consider "the sum of money, if any, . . . that would compensate the plaintiff for back pay and benefits, emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life caused by being subjected to racial discrimination based on retaliation and/or a hostile work environment based upon race."  The unobjected to instruction of course is the law of this case.  *See Green v. Am. Tobacco Co.*, 325 F.2d 673, 676 (5th Cir. 1963);  *see also* Wright & Miller, *Federal Practice & Procedure*, Civil 3d § 2558 at 177-178 (2008).  Also, the total award to Henry of $140,600, which includes a $90,000 punitive damage award on the hostile work environment claim, was capped at $50,000 pursuant to 42 U.S.C. § 1981a(b)(3)(A).  This was not objected to and is not challenged on appeal. This statutory cap was imposed on the total judgment and not on any individual items.  So, this makes it doubly unnecessary to speculate about whether the jury awarded any particular item of damages based on one claim as opposed to the other.