*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-0376

CORPCAR SERVICES HOUSTON, LTD. F/D/B/A CAREY OF HOUSTON, APPELLANT,

V.

CAREY LICENSING, INC., AND CAREY INTERNATIONAL, INC., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2016-CA-003785-B)

(Hon. William Jackson, Trial Judge)

(Argued December 4, 2019                    Decided November 7, 2024)

*Carlos M. Recio* for appellant.

*Deborah B. Baum*, with whom *Alex J. Lathrop* and *Michael A. Warley*, were on the brief, for appellees.

Before BECKWITH, *Associate Judge*, and RUIZ and THOMPSON,[*] *Senior Judges*.

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument. On February 18, 2022, she began her service as a Senior Judge.

RUIZ, *Senior Judge*: This is an appeal from the Superior Court's resolution of cross-motions for summary judgment in a breach of contract action. Appellant/plaintiff, CorpCar Services Houston, Ltd. ("CorpCar"), challenges the grant of summary judgment to appellees/defendants, Carey Licensing, Inc., and Carey International, Inc. (collectively "Carey"), in CorpCar's action for wrongful termination of a franchise license agreement. Carey terminated the agreement after CorpCar was found liable for punitive damages for subjecting its employees to a racially hostile work environment. CorpCar argues that the termination was wrongful because CorpCar did not materially breach its franchise agreement with Carey and because, even if it had, Carey did not provide CorpCar an opportunity to cure the violation as the agreement required. Carey argues, and the trial court found, that CorpCar's breach was incurable as a matter of law and, in the alternative, that CorpCar had an opportunity to cure but failed to do so.

We agree with Carey that CorpCar's breach was material, but disagree with its remaining arguments. First, we conclude that because the language of the franchise agreement is clear and comprehensively addresses Carey's termination right, fundamental principles of contract law preclude application of the "incurable breach" doctrine. Second, we find that there is a dispute of material fact as to whether Carey repudiated the franchise agreement, effectively denying CorpCar an

opportunity to cure. We, therefore, reverse the trial court's grant of summary judgment to Carey.

CorpCar also challenges the denial of its cross-motion for summary judgment. However, we conclude that issues of material fact remain for the jury to decide before CorpCar is entitled to any relief; in addition to whether Carey repudiated the agreement, a jury must decide whether CorpCar had in fact cured, or could have cured, its breach, had it been afforded an opportunity to do so. We thus remand the case for further proceedings consistent with this opinion.

## I.    Factual and Procedural Background

### A. The License Agreement

Carey is a national limousine and chauffeur-driven services company that licenses its brand to local companies such as CorpCar. In 2004, CorpCar acquired the "Carey of Houston brand," to operate a chauffeur-driven service in the Carey name in the greater metropolitan area of Houston, Texas.[1] In exchange for a monthly fee tied to CorpCar's total gross revenue from its chauffeur business, Carey

---

[1] CorpCar acquired the license by assuming the rights and obligations of National Limousine Service, which had acquired the license in 1982.

provided, among other things, advice on operational support, advertising, publicity services, equipment furnishings, and support for fulfillment requests.

Under the terms of Carey's "Standard Master License Agreement" (the "license agreement"), CorpCar was required to abide by a number of conditions. As relevant here, paragraph II.D of the license agreement required CorpCar to conduct its business "in an orderly and business[-]like manner and in compliance with all local, state and federal laws and all orders, rules and regulations issued pursuant thereto[.]"

Paragraph V of the license agreement enumerated specific circumstances under which the agreement could be terminated, providing as follows:

> V.  This Agreement shall not be terminated by either party during its term except under the following circumstances:
>
> (A) In the event Licensee shall fail to pay when due any obligations incurred hereunder or incurred in the operation of a Chauffeur Driven Business hereunder, Carey may, at its option, terminate this Agreement upon not less than thirty (30) days prior written notice, which notice shall specify the date on which such termination shall become effective, provided, if Licensee pays any such obligation during said thirty (30) day period, this Agreement shall not terminate but will continue as if such payment had been made when due.
>
> (B) In the event of any attempt by Licensee to transfer any right under, or interest in, this Agreement without prior written consent of Carey, or the insolvency, incapacity,

appointment of a Receiver or Trustee for the business of Licensee or the filing of a voluntary or involuntary petition of bankruptcy by or against Licensee, in which event this Agreement shall automatically terminate together with all right and interest of Licensee hereunder.

(C) Carey and Licensee shall both have the right to cancel for cause, provided that either party shall have thirty (30) days in which to cure any cause.[2]

Paragraph XI of the license agreement also provided for automatic termination in the event that the licensee failed to "start active operation of Chauffeur Driven Service hereunder not later than sixty (60) days from the date of this Agreement [and] continuously thereafter conduct an active chauffeur driven operation hereunder unless otherwise agreed to in advance and in writing by Carey."

CorpCar operated as "Carey of Houston" until 2016, when Carey terminated the licensing agreement with CorpCar.

## B. The *Henry* Decision

In 2015, the Fifth Circuit Court of Appeals affirmed a jury verdict and punitive damages award against CorpCar in a different matter, recounting an egregious episode of racial harassment of African-American employees in violation

---

[2] The agreement does not define what constitutes "cause," but Carey agreed at oral argument that a material breach of the agreement was required to justify invocation of Paragraph V(C).

of Title VII of the Civil Rights Act of 1964.[3] *Henry v. CorpCar Servs. Houston, Ltd.*, 625 F. App'x 607 (5th Cir. 2015) (per curiam). The following recitation of events is taken from the Fifth Circuit's opinion.

In 2009, a number of CorpCar's African-American employees had requested time off for Juneteenth (June 19), a Texas state holiday (and now also a federal holiday) commemorating the abolition of slavery in Texas. *Id.* at 608. Nevertheless, CorpCar scheduled safety meetings for June 18, 19, and 20, and required employees to attend at least one of the meetings. *Id.* A number of employees expressed disappointment about the timing of the meetings. Plaintiff James Henry had specifically requested the day off and discussed the significance of Juneteenth with a general manager. *Id.*

---

[3] CorpCar disputes the accuracy of the Fifth Circuit's characterization of the underlying facts. Carey, citing *Jackson v. District of Columbia*, 412 A.2d 948, 952 (D.C. 1980), argues that CorpCar "is estopped from disputing the factual findings established against it in the *Henry* opinion." CorpCar replies that "the Fifth Circuit's opinion describing the testimony in the record which a jury could have credited to support the Title VII violation finding did not represent conclusive facts." For purposes of this appeal, it suffices to note that the *Henry* litigation establishes, at a minimum, that CorpCar violated Title VII by subjecting its employees to a racially hostile work environment, and, in light of the punitive damages award, that CorpCar "engaged in intentional [racial] discrimination with reckless indifference towards the rights of the Plaintiffs." *Henry*, 625 F. App'x at 616.

Mr. Henry attended the June 18 meeting, where a "singing telegram" (i.e., a live performer in costume) hired by CorpCar's CEO, Christopher Wolfington, would perform. *Id.* The Fifth Circuit described the performance as follows:

> To the surprise of the employees in attendance, a white woman in a black gorilla suit entered the meeting. . . . The woman in the gorilla suit sang, danced, touched employees, and sat in their laps. She did Tarzan yells and repeatedly referred in a suggestive manner to "big black lips," "big black butt," and bananas. This went on for approximately ten minutes.

*Id.* The performer then turned her attention to Mr. Henry. The general manager, with whom Mr. Henry had previously spoken, leaned in and said to him, "Okay. Here's your Juneteenth." *Id.* at 608-09. At this point, the performer called out his name, mocked his affection for Juneteenth, and made racist and sexually suggestive comments at him in front of everybody in attendance. *Id.*

Mr. Henry and other employees were extremely offended by the performance, which "they perceived . . . as CorpCar comparing them to gorillas." *Id.* Management ignored their complaints. *Id.* At 2:30 the next morning, on Juneteenth, Mr. Henry was called in to work at 7 A.M., four and a half hours later, despite having requested the day off. *Id.* While waiting several hours to actually be scheduled for a run, Mr. Henry was instructed to open the stuck front gate, "only to find he had opened the gate for the same woman in the gorilla suit." *Id.* She again called

Mr. Henry by name and referred to herself as "your big black woman," and made crude sexual remarks. *Id.* She went on to perform at three more safety meetings over the next couple of days. *Id.* CorpCar management continued to ignore Mr. Henry's concerns about the performances. *Id.*

Mr. Henry and another CorpCar employee, Homer Randle, sued CorpCar in federal court. *Id.* at 610. A jury found CorpCar liable on the plaintiffs' hostile work environment claims and awarded both compensatory and punitive damages. *Id.* In affirming the punitive damages award, the Fifth Circuit noted that "[a]ny doubt about the officials' indifference towards the Plaintiffs' rights [was] removed when they brought the performer back for repeat performances after Plaintiffs explained in detail how and why they were offended." *Id.* at 616. "The jury could have readily inferred that" various company executives, including Mr. Wolfington, "subjectively understood that comparing African-Americans to gorillas at mandatory meetings near Juneteenth[] violates federal law." *Id.*

Approximately a year after the Fifth Circuit issued its opinion, Mr. Henry notified Carey of the case by forwarding an email chain to a Carey customer service email address, including the case caption in the body of the email. In the forwarded email thread, CorpCar represented to Mr. Henry that it did not have the funds to pay

the judgment against it and proposed a settlement agreement.[4] Mr. Henry threatened to go to the media regarding CorpCar's failure to pay the judgment in full, noting that "Carey of Houston is a franchise[e] of Carey international."

## C. Termination of the License Agreement

On April 21, 2016, Carey mailed CorpCar a letter, "exercising its right under Article V(C) of the License Agreement to terminate the License Agreement." Carey alleged CorpCar "fail[ed] to conduct [its] business in compliance with all local, state and federal laws as evidenced by the ongoing pattern of racial discrimination against [their] current and/or former employees." Carey cited the *Henry* litigation and other subsequent discrimination complaints by CorpCar employees as evidence of violations of federal and state antidiscrimination laws which breached CorpCar's obligations under Paragraph II(D) of the License Agreement (the provision requiring compliance with federal and state law).[5]

---

[4] In exchange for the settlement, CorpCar had offered to forgo its effort to seek review of the Fifth Circuit's decision in the Supreme Court. CorpCar's subsequent petition for certiorari was denied. *Corpcar Servs. Houston, Ltd. v. Henry*, 577 U.S. 822 (2015).

[5] After Mr. Henry's lawsuit, two other employees had made informal complaints about racially discriminatory conduct occurring in the workplace at CorpCar. As far as the record shows, no formal action was ever taken on these complaints.

Carey's letter explained that CorpCar's conduct was "contrary to the values held by" Carey and had "irreparabl[y] harm[ed] . . . Carey's reputation and the value of the CAREY® brand."[6] "As a result," the letter concluded, "these breaches cannot be cured and Carey is exercising its right to terminate the License Agreement as well as [CorpCar's] relationship with Carey."

The termination was to become effective forty days from receipt of the letter, May 31, 2016, a "sufficient" period of time for CorpCar to "take any and all necessary actions such as making preparations to remove any references to the CAREY® brand from [CorpCar's] website, vehicles, and advertising materials." The letter designated a Carey employee to coordinate with for "such practical matters . . . necessary to ensure an orderly winding down of our business relationship."

Shortly after CorpCar received the termination letter, Mr. Wolfington and Carey CEO Gary Kessler spoke by phone. According to Mr. Wolfington, he asked whether there was a way to "resolve the termination, i.e. some way to cure it[,]" and expressed interest in a personal meeting. Mr. Wolfington later followed up by email, asking for confidentiality around the termination letter and expressing optimism in

---

[6] Carey noted that "Carey of Houston" was included in the "title of the lawsuit" and that the lawsuit had been reported in the media, with at least one news outlet having "linked it to the CAREY® brand."

"alternative paths forward that we believe have strong potential to address the concerns" shared in the call. Mr. Kessler clarified on April 29 that although he had agreed to "hear [Mr. Wolfington] out," he "did not want to give [him] false hope as [Mr. Kessler] [could not] imagine a proposal that would change [his] mind on the termination." To Mr. Kessler, "nothing . . . changed, and the termination letter [stood]."

Shortly thereafter, on May 5, CorpCar asserted, in writing, that the License Agreement "provides a cure right, and . . . that any conduct described in [the termination] letter that could be characterized as a violation of the agreement has been cured or is without merit." While CorpCar described the allegations underlying the *Henry* verdict as "mischaracterizations and outright fabrications," it emphasized that since the time of the underlying conduct in *Henry* it had "upgraded [the company's] HR position with an experienced HR professional, . . . implemented diversity, discrimination and harassment trainings and upgraded [the] local management team with new and more racially diverse personnel."[7] Finally, while

---

[7] In 2011, after an investigation by the EEOC of the singing telegram incidents found "reasonable cause" to believe there had been a Title VII violation, CorpCar entered into a two-year conciliation agreement with the EEOC in which it agreed to various remedial measures, including annual comprehensive training sessions for all employees and new hires on racial harassment policies.

maintaining that the "purported termination [was] invalid and not justified," CorpCar requested a meeting with Carey to address the concerns Carey had raised.

Carey refused. It reiterated their position on May 13 that CorpCar's breach of the License Agreement was "simply not capable of being cured" and that the License Agreement would be terminated accordingly. "[A]fter May 31, 2016," the letter declared, "your business will lose all rights to use the Carey name and trademarks and must cease to be associated with Carey in any way."

CorpCar subsequently sued Carey in Superior Court for breach of contract and moved for a temporary restraining order ("TRO") to prevent the termination of the license agreement pending further litigation. The motions court (Judge Gregory Mize) denied CorpCar's request for a TRO, reasoning that CorpCar had not shown sufficient likelihood of substantial irreparable harm because there was an adequate remedy at law, i.e., money damages.[8] The termination proceeded, CorpCar went out of business and sold off its assets to another company several months later. Shortly thereafter, Carey established a subsidiary to continue operating under the "Carey of Houston" brand in the Houston metropolitan area.

---

[8] Judge Mize nevertheless opined that CorpCar was likely to "prevail on the merits" because, despite CorpCar's "clear and significant error," Carey's position on curability was "unreasonable."

### D. Post-Termination Proceedings in Superior Court

CorpCar unsuccessfully moved to amend its complaint to add a claim for breach of the covenant of good faith and fair dealing, as well as a claim for punitive damages. CorpCar alleged that Carey used the *Henry* litigation as a pretextual basis to terminate the agreement in order to "hid[e] its plans to establish a presence in Houston post-License Agreement termination."

CorpCar's proposed amendments included allegations that Carey stopped referring customers to CorpCar and instead established a "direct Carey-owned licensee in the Houston metropolitan area, operating under the name 'Carey Houston.'" In denying the motion to amend,[9] the trial court (Judge William Jackson) opined that the new allegations went to the "issue[] of damages." While nothing would preclude CorpCar from bringing those facts out at trial, allowing "an amended complaint . . . would be inappropriate" because discovery was "pretty much closed." Counsel for CorpCar explained that he had tried unsuccessfully to obtain discovery on Carey's motivations for the termination, but agreed that "substantively the case is not affected by it."

---

[9] The trial court also denied a separate motion for judgment on the pleadings.

The parties thereafter filed cross-motions for summary judgment. The trial court granted summary judgment to Carey in an oral ruling. The court stated that there were "two issues" to be decided: "one, whether the breach here was incurable; and, number two, . . . whether or not the termination prevented [CorpCar] from curing [or] taking steps to cure to avoid losing their franchise."[10] As to the first issue, the judge concluded that "as [a] matter of law there are certain circumstances which are incurable and this is one of them . . . ."[11] In the alternative, the judge concluded that CorpCar had neither proffered any possible cure nor taken any steps to establish that it had cured the alleged breach during the 40-day period from the termination letter to the effective date of termination. The trial court suggested that

---

[10] CorpCar had also argued in its written submission that there had been no material breach to justify termination of the contract, an argument implicitly rejected by the judge in finding for Carey. The trial judge also stated that CorpCar's allegations of "pretext" were "irrelevant" to whether Carey had cause to terminate.

[11] The trial court analogized this case to a 2004 Superior Court case, *D.C. Hous. Auth. v. Cherry*, No. 03-LT-15931, 2004 D.C. Super. LEXIS 25 (D.C. Super. Ct. Jan. 20, 2004), which concluded that a landlord was not necessarily required to provide a statutorily mandated opportunity to cure "when there is evidence that a tenant committed a discrete criminal act in violation of the lease." *Id.* at *5. In *Cherry*, the tenant had been arrested for assaulting another tenant with a knife and charged with assault with a deadly weapon. *Id.* at *1. Under those circumstances, the trial court reasoned that requiring an opportunity to cure would lead to "absurd results" and questioned what could possibly have been done to cure (e.g., refrain from assaulting tenants for another month?). *Id.* at *7. Similarly here, the trial court said, it would "raise[] a degree of absurdity" to suggest that CorpCar could cure by, for example, simply not hiring the woman in the gorilla suit again.

paying the judgment from the *Henry* lawsuit was one of "the things that [CorpCar] could have done under the circumstances."[12]

CorpCar moved to alter or amend the judgment under Super. Ct. Civ. R. 59(e), attaching additional evidence not previously considered in the summary judgment record (e.g., a partial video of the singing telegram performance and additional documentation relating to the *Henry* litigation, including the settlement agreements ultimately reached with the plaintiffs). In a written order, the trial court denied CorpCar's motion, rejecting its contentions of legal error and declining to consider new evidence that could have been submitted prior to summary judgment.[13]

---

[12] According to an affidavit filed by Mr. Wolfington, he and CorpCar's board were prepared to raise funds to pay the judgment or tender/accept his resignation as CorpCar's CEO, but planned to take one of those actions only if Carey would accept it as a cure. It appears that Carey raised the issue of the unpaid judgment as a possible cure for the first time in opposing the TRO, after the effective date of contract termination. Mr. Wolfington asserted that the judgment was ultimately paid in March of 2017, after CorpCar sold its assets but before the summary judgment proceedings.

[13] CorpCar supplied no satisfactory explanation for failing to make these materials part of the initial summary judgment record, arguing only that they were responsive to some of the trial judge's concerns. *See Dist. No. 1—Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 278-79 (D.C. 2001) (explaining that a judge was "not required to consider a new argument and new facts that [the movant] could not justify failing to present to the court earlier"). While CorpCar included a number of those new items in the Joint Appendix in this appeal, we likewise decline to rely on them in evaluating the correctness of the trial court's summary judgment ruling, since they were not before the court when it ruled on the summary judgment

CorpCar appeals the grant of summary judgment to Carey and the denial of its summary judgment motion.

## II.     Analysis

We review the trial court's ruling on summary judgment de novo, "applying the same standard as the trial court did in ruling on the motion." *Washington v. District of Columbia*, 137 A.3d 170, 173 (D.C. 2016). "Our standard of review is the same whether we review one motion for summary judgment or, as here, two cross-motions." *U St. Music Hall, LLC v. JRC Standard Prop., LLC*, 285 A.3d 1250, 1255 (D.C. 2022). "To prevail on a motion for summary judgment, a party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Id.* (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001)). In evaluating each motion, "we view the record in the light most favorable to the nonmoving party." *Id.* While the "presentation of an issue on cross-motions for summary judgment may signal that there are no material facts in dispute," a dispute of material fact may still exist where "the parties rely on the same

motion, *see Kibunja v. Alturas, LLC*, 856 A.2d 1120, 1128 (D.C. 2004) ("[W]e may only consider facts that were before the trial court at the time it ruled."), and would not change the outcome of this appeal in any event. On appeal CorpCar does not argue that the trial court's denial of the Rule 59(e) motion was an abuse of discretion.

primary facts but argue critically different inferences from them." *Beckman v. Farmer*, 579 A.2d 618, 629 (D.C. 1990).

Under District of Columbia law,[14] a party asserting breach of contract must prove four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 595 (D.C. 2023) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). "A total breach may be by repudiation or by such a material failure of performance when due as to 'go to the essence' and frustrate substantially the purpose for which the contract was agreed to by the injured party." *Keefe Co. v. Americable Int'l, Inc.*, 755 A.2d 469, 475 (D.C. 2000) (quoting *San Carlos Irr. & Drainage Dist. v. United States*, 23 Cl. Ct. 276, 279 (1991)).

CorpCar's complaint is that Carey terminated the license agreement without cause and without adhering to the agreement's cure provision. In the sections that follow, we: (1) reject CorpCar's argument that it did not materially breach the license agreement; (2) conclude that the trial court erred in ruling that CorpCar's breach was incurable as a matter of law; and (3) identify several disputed issues of

---

[14] The license agreement provides that it "shall be construed according to the laws of the District of Columbia."

material fact that must be decided by the factfinder: whether CorpCar had the opportunity to cure it was due under the agreement, whether the breach was cured, and whether affording an opportunity to cure would have been futile in the circumstances of this case. We therefore affirm in part and reverse in part. We affirm the denial of summary judgment to CorpCar, reverse the grant of summary judgment to Carey, and remand the case for further proceedings.

## A. Material Breach

We first address CorpCar's contention that Carey had "no cause" to terminate the agreement because CorpCar's Title VII violation was not material as it did not go "to the essence [nor] frustrate substantially the purpose for which the contract was agreed to by the injured party." (quoting *Keefe*, 755 A.2d at 475). "Whether a particular breach of a contract is material is a classic issue of fact." *3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 445 (D.C. 2007) (quotation marks omitted). However, summary judgment is appropriate where "the evidence on materiality of the alleged breach is . . . 'so one-sided that [one party] must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)); *see also* 23 *Williston on Contracts* § 63:3 (4th ed.) ("The determination whether a material breach has occurred is generally a question of fact," but "if there is only one reasonable conclusion, a court must address what

is ordinarily a factual question as a question of law."). As the parties agree, there is no dispute of historical fact here, and we conclude that the evidence is so one-sided that Carey is entitled to judgment as a matter of law on the issue of CorpCar's material breach.

A breach is material when, inter alia, the non-breaching party receives as a result "something 'substantially less or different from that for which he bargained[.]'" *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970) (quoting Simpson, Contracts § 159 (2d ed. 1965); *see also 3511 13th St. Tenants' Ass'n*, 922 A.2d at 445 (explaining that a material breach analysis requires "an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties" (quoting *Sahadi v. Cont'l Ill. Nat. Bank & Tr. Co.*, 706 F.2d 193, 196 (7th Cir. 1983)). CorpCar argues that its breach was immaterial because there is no evidence that Carey was "deprived of any economic benefit of the contract by reason of the claimed breach."[15] This argument misses the point: CorpCar's performance under the contract was not limited to its monthly royalty payment to Carey. Rather, part of what Carey specifically bargained for was that its franchisee, bearing the name

---

[15] As an example, CorpCar's brief argues that there was no financial detriment as Carey's royalties under the agreement did not suffer, and in fact increased between 2009 and termination in 2016.

and logo of Carey's national brand, would conduct its business, among other things, "in compliance with all local, state and federal laws[.]"[16]

There is a gray area regarding the extent to which any given violation of law might constitute a material breach of a contractual provision that generally requires a party to comply with the law. *See Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (contractual obligation to comply with "all applicable law" provided cause to terminate for failure to pay taxes but would likely not for violations of parking laws). But we are not in that gray area in this case. Here, the nature of the law violated and the award for punitive damages suffice to refute any claim that CorpCar's racially discriminatory conduct did not materially breach its contractual obligation. The *Henry* litigation established not only that CorpCar violated federal anti-discrimination law, but that CorpCar's "conduct was so shocking and offensive as to justify an award of punitive damages" and that "CorpCar, through its representatives, acted with 'evil motive or intent.'" *Henry*,

---

[16] CorpCar's brief points to Carey's inaction in the face of its knowledge of the incident underlying the *Henry* litigation since at least 2013—when Carey received a copy of the EEOC charge of discrimination—as proof that it did not consider the Title VII judgment against CorpCar to present a serious risk to its brand. But being aware that a complaint had been filed is not the same as being informed that a verdict and punitive damages have been entered against CorpCar and affirmed on appeal. As far as the record shows, Carey became aware of the final judgment in 2016 when Mr. Henry sent the email chain about his difficulty collecting on the judgment and threatened to expose that CorpCar was a Carey licensee.

625 F. App'x at 615 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). *See supra* note 3. The jury verdict and affirmance on appeal establish there is only one reasonable conclusion, that CorpCar materially breached the contract. On that question, summary judgment to Carey was appropriate.

As an alternative route to disputing that Carey had a legitimate cause to terminate the agreement, CorpCar argues that Carey invoked the *Henry* litigation pretextually and acted in bad faith with the ultimate goal "to abscond with CorpCar's goodwill in Houston and appropriate it for itself at no cost." This is the factual basis for the claim that Carey breached the implied covenant of good faith and fair dealing.

"Every contract contains an implied covenant of good faith and fair dealing." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015). "To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege either 'bad faith or conduct that is arbitrary and capricious.'" *Id.* (quoting *Abdelrhman v. Ackerman*, 76 A.3d 883, 891-92 (D.C. 2013)). "[I]f a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." *Aronoff v. Lenkin Co.*, 618 A.2d 669, 682 (D.C. 1992) (quoting 5 S. Williston, *A Treatise on the Law of Contracts* § 677 (3d ed. 1961)). Thus, "a defendant would violate the implied covenant if it compelled a plaintiff's violation

of a for-cause-termination provision in order to justify termination." *Thompson v. Advanced Armament Corp.*, 614 F. App'x 523, 525 (2d Cir. 2015) (summary order). "Absent such purposeful sabotage, however, a termination for cause cannot breach the implied covenant, even if motivated by reasons unrelated to cause." *Id.*; *but cf. Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992) (suggesting that it would show "bad faith" to "appropriate the value" of a successful franchise by cancelling it on a "pretext," i.e., "utterly trivial violations of the contract that the company would [otherwise] have overlooked").

We agree with the trial court's analysis that Carey had a right to invoke the Title VII violation as cause to terminate the license agreement under Paragraph V(C), even if that invocation was pretextual. Here, CorpCar did not allege—nor does the record support—that Carey somehow induced CorpCar to engage in the egregious conduct that violated Title VII. Nor, as explained above, can CorpCar's violation be deemed trivial. As Carey did not induce the violation and in no way interfered with CorpCar's ability to perform its contractual obligation to comply with the law, CorpCar's unforced Title VII violation sufficed for there to be cause under the contract. In sum, we conclude as a matter of law that CorpCar's material breach gave Carey sufficient cause to invoke Paragraph V(C) of the license agreement.

But that is not the end of the issue. Paragraph V(C) provides for a cure period before termination for cause. CorpCar argues that Carey foreclosed that opportunity by refusing to engage with CorpCar in good faith during the forty-day period following the notice of termination. The implied covenant of good faith and fair dealing extends through the "performance or enforcement of a contract" and can be violated through "interference with or failure to cooperate in the other party's performance." Restatement (Second) of Contracts § 205 cmts. a & d (Am. Law. Inst. 1981); *see also Aronoff*, 618 A.2d at 682 ("There is an implied covenant in each contract that the parties will 'extend reasonable cooperation' in clearing the way for performance." (quoting *Horlick v. Wright*, 104 A.2d 825, 827 (D.C. 1954))). As we discuss *infra*, Carey's notice of termination and its conduct following the notice could have had an impact on CorpCar's obligation to cure in order to avoid termination.[17]

---

[17] As noted in the text, the trial court denied, as untimely, CorpCar's motion to amend the complaint to add a claim of breach of the implied covenant of good faith and fair dealing. CorpCar does not challenge that denial on appeal. As the trial court and the parties appear to acknowledge, however, denial of leave to amend the complaint does not preclude CorpCar from presenting evidence of Carey's conduct after it gave notice of termination. We leave the issue of the relevance of specific items of evidence to the trial court's discretion on remand.

We thus turn to the trial court's rulings regarding the opportunity to cure required under that provision.

## B. "Incurable" Breach

The trial court granted summary judgment to Carey on the basis that CorpCar's Title VII violation was an incurable breach as a matter of law, thus excusing Carey's express contractual obligation to provide an opportunity to cure. CorpCar argues that "incurable breach" is an "unsound" concept—at odds with fundamental principles of contract law—that we should reject as inconsistent with District of Columbia law. Whether, as the trial court held, certain breaches are considered incurable as a matter of law in the District of Columbia is an issue of first impression for our court.

An incurable breach (or "vital breach") has been described as a breach that is "so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 652 (Pa. 2009). Where such a breach has occurred, some courts have held that "the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary." *Id.*; *accord Larken, Inc. v. Larken Iowa City Ltd. P'ship*, 589 N.W.2d 700, 704-05 (Iowa 1998) (holding that a breach

of the "implied duty of honesty and fidelity" by the manager of a hotel who engaged in self-dealing was incurable because it "went to the heart of the contract" and "[m]erely requiring Larken to retroactively undo its wrongdoings . . . would not be an adequate remedy"); *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 232 (9th Cir. 1989) (applying Arizona law and concluding that "a distinction between 'curable' and 'vital' breaches[ ] is sound"); *cf. Olin Corp. v. Cent. Indus., Inc.*, 576 F.2d 642, 648 (5th Cir. 1978) (applying Mississippi law and holding "that the termination provision in the Olin-Central agreement did not provide the exclusive means of termination in the event of a material breach which had the effect of substantially defeating the purpose of the contract").[18]

The precise contours of an incurable or vital breach are not entirely clear. As CorpCar notes, the concept is often applied in cases in which courts have found that fraudulent business dealings undermined any possibility of future trust between the contracting parties. *See, e.g.*, *LJL Transportation*, 962 A.2d at 647 (finding an

---

[18] Another possible reading of these cases is that—rather than establishing a special category of breach distinguishable from a material breach—they stand only for the proposition that a party may terminate a contract without giving notice based upon a breach that goes to the core of the contract unless precluded from doing so by an exclusive termination provision, necessarily implying that "parties are free to agree to such an exclusive term[.]" *See DNC Parks & Resorts at Yosemite, Inc. v. United States*, 133 Fed. Cl. 314, 319-20 (2017) (noting that *Olin* in particular "qualifies its conclusion as applicable only if the termination provision at issue is not 'exclusive.'"). As we note later in the text, the termination provision in the license agreement was exclusive.

incurable breach in a scheme to defraud a franchisor of royalties it was due). In some formulations, the concept strikes us as troublingly vague—for example, it has been suggested that "[c]ourts, using their good sense, will be able to tell breaches which excuse the obligation to give notice from breaches which do not." *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 211 (2d Cir. 2014) (quoting *In re Best Film & Video Corp.*, 46 B.R. 861, 875 (Bankr. E.D.N.Y. 1985)). We agree with the observation of the Texas Court of Appeals, when it declined to adopt the doctrine, that "[w]hat is egregious enough to constitute a vital breach for one jury or court, might vary with another." *Duncan v. Woodlawn Mfg., Ltd.*, 479 S.W.3d 886, 897 (Tex. App. 2015). We also agree with the court's view that "injecting the idea of a 'vital breach' into a contract that already comprehensively addresses reasons for termination would only add uncertainty to the parties' dealings." *Id.*

We find the *Duncan* case instructive here. Duncan, an executive employee at Woodlawn Manufacturing, was terminated for cause because of: (1) "several sexual liaisons with subordinate employees which reflected adversely on the workplace, and exposed the company to potential sexual harassment liability"; and (2) a "problem with alcohol" that interfered with his work. *Id.* at 890-92. As relevant here, Duncan's employment agreement enumerated a specific set of circumstances under which "cause" for termination existed, including an employee's breach of the agreement, "if such breach has not been cured by the Employee within 30 days of

his receipt of written notice from the Employer specifying such breach[.]" *Id.* at 889. Duncan argued that he was wrongfully terminated because he received no written notice and no opportunity to cure. *Id.* at 892. At trial, a jury found that Woodlawn had failed to comply with the agreement but that its "failure to comply was excused by Duncan's breach." *Id.* at 893.

On appeal, Woodlawn argued that "some breaches of contract which fundamentally undermine the essential purpose of an agreement justify immediate termination, even in the face of notice and cure provisions." *Id.* at 895. The Texas appellate court discussed the holdings in *Olin*, 576 F.2d 642, and *Larken*, 589 N.W.2d 700, which were cited in support of Woodlawn's argument, but declined to decide on the validity of those holdings *vel non*. *Id.* at 895-96. Instead, the court focused on the specific contractual termination provision at issue, finding that it "exhaustively detail[ed] the various ways that Duncan could leave employment[.]" *Id.* at 897. The court "rejected the 'vital' breach line of cases in this particular situation," explaining that "[w]hen parties have spoken comprehensively on an issue in their contract, we are not at liberty to add contractual terms they never intended." *Id.* at 896-97. However, on the specific facts presented (viewed in the light most favorable to the jury's verdict), the court concluded that "there [was] legally and factually sufficient evidence [from] which the jury could have believed that the notice and cure provision would have been futile." *Id.* at 898.

Like the termination provision at issue in *Duncan*, the license agreement here "comprehensively addresses reasons for termination." *Id.* at 897. "For a contract remedy to be exclusive of other remedies, it must be apparent from the face of the contract that the parties intended to make it so." *Hto7, LLC v. Elevate, LLC*, 319 A.3d 368, 377 (D.C. 2024) (quoting *Pernice v. Bovim*, 183 F.Supp.3d 84, 90 (D.D.C. 2016)). It is so apparent here. Paragraph V states clearly that "[t]his [a]greement shall not be terminated by either party during its term except under the following circumstances[.]" Paragraph V(B) then enumerates a specific set of circumstances, e.g., insolvency or a petition for bankruptcy, under which the agreement "shall automatically terminate," none of which occurred here. Carey agrees that it relied instead on Paragraph V(C), which gives either party the "right to cancel for cause, provided that either party shall have thirty (30) days in which to cure any cause."[19] Thus, unlike the automatic termination provided for in Paragraph V(B) (and also in Paragraph XI), termination of the license agreement under V(C) is contingent on the

---

[19] While seemingly used interchangeably in the license agreement, termination and cancellation (i.e., rescission) are distinct contractual remedies. *See generally Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 677-80 (E.D. Wis. 2005); *see also Ashker v. Aurora Med. Group, Inc.*, 841 N.W.2d 297, 302 (Wis. Ct. App. 2013) (Neubauer, J., concurring) ("Termination of a contract does not seek to undo the contract, but to terminate obligations going forward, while rescission is the unmaking of a contract."). Since Carey purported to exercise a right to terminate pursuant to Paragraph V(C) of the agreement, and the distinction has not been briefed, we discuss only Carey's right to terminate under the agreement.

breaching party's opportunity to first "cure any cause." In other words, once paragraph V(C) was invoked, provision of an opportunity to cure was a condition precedent to termination of the agreement. *See Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 549 (D.C. 2000) (defining a condition precedent as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due" (quoting Restatement (Second) of Contracts § 224 (Am. L. Inst. 1981))).

District of Columbia law recognizes the "'objective' law of contracts, [under which] 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties . . . .'" *Dyer v. Bilaal*, 983 A.2d 349, 354 (D.C. 2009) (quoting *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)). We perceive no ambiguity in the terms of Paragraph V, an issue we decide de novo. *See Hto7*, 319 A.3d at 376 ("The proper interpretation of a contract, at least when it is free from ambiguity . . . , is a legal question, which this court reviews *de novo*." (internal quotation marks omitted)). To declare a breach "incurable" where the parties' contract clearly and comprehensively addressed the issue of termination would be tantamount to amending the parties' agreement with an additional termination provision the parties never negotiated and to which they never consented. It is beyond our role to do so. *See Jacobson Holman, PLLC v. Gentner*, 244 A.3d 690, 697 (D.C. 2021) ("[C]ourts generally do not imply terms into an

agreement when the contractual language at issue is otherwise clear."); *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996) ("[W]here the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties.").

We thus decline to supplement the plain terms of the written contract with a judicially imposed incurable breach exception. *See Duncan*, 479 S.W.3d at 897 ("If we judicially add another category, whether called vital breach or something else, we would frustrate the intent of the parties as expressed in their agreement, something we are prohibited from doing."). Had Carey desired a broader termination right to protect the reputation of its brand (e.g., termination without opportunity to cure in the event of an adjudicated criminal act or civil rights violation), it could have contracted for exactly that, as it did in Paragraphs V(B) and XI for other breaches. *See Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir. 1985) (explaining that a separate provision provided for automatic termination upon death of the franchisee and that "[i]f Mobil believed the sale of non-Mobil gasoline was sufficiently like death to warrant automatic termination of the contract it could have easily said so"); *Ashker v. Aurora Med. Group, Inc.*, 841 N.W.2d 297, 300 (Wis. Ct. App. 2013) ("If Aurora had wanted to be able to immediately terminate Ashker under the circumstances presented in this case, it could have negotiated such a term into the employment agreement."); *see also* Jason J. Stover, *No Cure, No*

*Problem: State Franchise Laws and Termination for Incurable Defaults*, 23 Franchise L.J. 217, 220 (2004) ("Most franchise agreements anticipate this precise issue by providing a notice and cure period for ordinary breaches, but permitting immediate termination for serious and incurable breaches.").[20]

We thus hold that where, as here, a contract speaks comprehensively about the parties' termination rights, judges are not empowered to determine, as a matter of law, which breaches are so "fundamentally destructive" such that they cause the trust underlying the contractual relationship to "essentially evaporate." *LJL Transp.*, 962 A.2d at 567. In addition to ignoring the plain terms of the agreement, that principle runs contrary to our case law explaining that law and equity abhor forfeitures of contract. *See, e.g.*, *Chambers v. Cobb*, 193 A.3d 123, 126 (D.C. 2018); *Tsintolas Realty*, 984 A.2d at 186; *Ass'n of Am. R.R.s v. Connerton*, 723 A.2d 858, 862 (D.C. 1999). As discussed further *infra* Part II.D, whether and how a material

---

[20] The record on appeal contains sample copies of other Carey "Master License Agreements" that give the licensor broader termination rights, including automatic termination if the licensee is "convicted of a felony, a crime of moral turpitude, or a crime or offense relating to the operation of [the] Chauffeured Transportation Services Business, or . . . fail to comply with any laws or regulations applicable to the operation of your Chauffeured Transportation Services Business." The sample agreements also make clear the termination rights under the agreement are additional to "other legal and equitable rights." These agreements were not part of the summary judgment record before the trial court, but are nonetheless illustrative of the legal point that Carey could have drafted a broader termination provision.

breach can be cured is a fact-intensive question to be assessed against the metric of substantial performance with the breaching party's contractual obligations. *See* 15 *Williston on Contracts* § 44:52 (4th ed.) ("The doctrine of substantial performance is intended to protect a party's right to be compensated when it has performed in all material and substantive respects and to avoid the possibility of a forfeiture due to technical, minor, inadvertent, or unimportant deficiencies." (footnote omitted)). Accordingly, we conclude that the trial court erred in granting summary judgment to Carey on the basis that the breach was incurable as a matter of law.

## C. Opportunity to Cure or Repudiation?

The trial court held in the alternative that Carey was entitled to summary judgment because, even if it were required to afford CorpCar an opportunity to cure, CorpCar neither took nor proffered any steps to cure the breach in the 40 days between receiving the initial termination letter and the effective date of the termination. In so ruling, the judge appears to have implicitly accepted Carey's argument that the forty-day period to terminate was functionally equivalent to the contractually guaranteed opportunity to cure.[21] CorpCar, on the other hand, argues

---

[21] Carey notes that the period actually lasted 47 days because it delayed the effective date of termination pending resolution of CorpCar's motion for a TRO to stop the termination. This distinction does not affect our analysis.

that there was no meaningful cure period because Carey repudiated the contract and failed to cooperate with CorpCar's efforts to discuss a possible cure. We conclude that whether Carey repudiated the contract without providing an opportunity to cure, provided CorpCar sufficient opportunity to cure, or as we discuss infra, CorpCar had already sufficiently cured its breach, are disputes of material fact to be resolved by the jury.[22]

Whether a party has repudiated a contract is a question of fact. *3511 13th St. Tenants' Ass'n*, 922 A.2d at 445 n.9; *see also* 23 *Williston on Contracts* § 63:15 (4th ed.) ("[T]he question whether a party has repudiated a contract is one of fact, as is the question of whether the repudiation was justified." (footnotes omitted)). "For a repudiation of a contract by one party to be sufficient to give the other party the right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Keefe*, 755 A.2d at 475 (quoting *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 125 (D.C. 1976)); *see also* Restatement (Second) of Contracts § 250 cmt. b (Am. L. Inst. 1981) ("In order to constitute a repudiation, a party's language must be sufficiently

---

[22] The parties' and the trial court's analyses appear to have assumed that the cure period began upon Carey's letter giving notice of termination. The license agreement did not expressly say, although the termination letter stated that the 40 days it provided for CorpCar to wind down its use of Carey's name—which Carey alternatively argues CorpCar could have used to cure its breach—began upon receipt of the letter. We have no reason to question their assumption.

positive to be reasonably interpreted to mean that the party will not or cannot perform. Mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation[.]"). If the effect of Carey's notice and subsequent communications was to express unequivocally that it was terminating the contract irrespective of any efforts by CorpCar to cure, this would constitute repudiation of Carey's performance obligations under Paragraph V(C). *See, e.g.*, *Skyco Res., LLP v. Fam. Tree Corp.*, 512 P.3d 11, 19-20 (Wyo. 2022) (finding that a letter constituted repudiation, rather than a notice to cure, where it "unequivocally announced it would not complete the purchase"). Repudiation of the contract is a material breach that relieves the other party from its obligation to perform under the contract. *See Keefe*, 755 A.2d at 475 (explaining that a "total breach may be by repudiation") (citation omitted); Restatement (Second) of Contracts § 253(2) (Am. L. Inst. 1981) ("[O]ne party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.").

CorpCar makes a strong argument that the plain language of Carey's communications constituted an unequivocal repudiation. Carey's April 21 letter told CorpCar its "breaches cannot be cured and Carey is exercising its right to terminate the License Agreement as well as [CorpCar's] relationship with Carey." Mr. Kessler's April 29 email underscored that same point, explaining that he could not "imagine a proposal that would change [his] mind on the termination . . .

nothing . . . changed, and the termination letter stands." The May 23 letter similarly announced that the breach was "simply not capable of being cured" and that "after May 31, 2016, [CorpCar] [would] lose all rights to use the Carey name and trademarks and must cease to be associated with Carey in any way." A jury could certainly conclude that these statements consistently communicated that termination was imminent and irrevocable, regardless of what actions CorpCar took prior to the effective date of termination. That the termination was not effective immediately is not by itself sufficient to negate that inference. *See DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 553 n.4 (Wash. Ct. App. 2014) (rejecting a similar argument where termination was not effective immediately but "[t]he letter unequivocally purported to terminate the agreement, not to give a notice of default").

Carey argues for a contrary inference based on a number of facts: that CorpCar had longer than the contractual cure period to take action before the termination became effective, that Carey cited Paragraph V(C) in its letter (which Carey argues implicitly invoked the cure period), and that Mr. Kessler agreed to "hear . . . out" Mr. Wolfington and spoke with him on the phone after the initial termination letter. Per Carey's recounting, rather than proposing or attempting to take additional steps to cure, CorpCar instead tried to persuade Carey that CorpCar cured the breach in the intervening years since the *Henry* judgment became final or, alternatively, claimed Carey's allegation of breach was "without merit." Thus, in Carey's view, it

was CorpCar's failure to take further curative action and insistence that there was nothing to cure that rendered the forty days ineffectual as a cure period.

Given the dueling narratives and fact-intensive nature of this inquiry, we leave it to the jury on remand to determine which of these competing views is best supported by the evidence. If a jury finds that Carey repudiated the agreement before affording any opportunity to cure, then CorpCar was not obligated to spend the last days of its franchise relationship attempting various cure measures in vain, after Carey had already plainly signaled that any such effort on CorpCar's part would be futile. *See* 23 *Williston on Contracts* § 63:44 (4th ed.) ("The general rule with respect to repudiation is that when one party repudiates a contract, the nonrepudiating party is discharged from its duty to perform[.] . . . To recover damages, in addition to proving repudiation, the nonbreaching party need only show that it would have been ready and willing to have performed the contract, if the repudiation had not occurred."); *cf. Indep. Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 870 (D.C. 2005) (explaining that "it would have been futile and wasteful for [the buyer] to obtain financing for a closing in which the seller was not going to participate" and rejecting the "proposition that in order to be 'ready, willing and able,' a purchaser must go through useless motions and incur unnecessary expense"). CorpCar's failure to take additional concrete actions after receiving the termination letter(s) would thus not supply an independent basis for the grant of

judgment to Carey. If, on the other hand, the jury finds that Carey did not repudiate the contract, and the cure provision remained in effect, it may still consider CorpCar's arguments that: (1) it had cured the material breach before ever receiving the termination letter, as discussed further *infra* Part II.D, and (2) even if more remained to be done, Carey frustrated its right and intention to cure by refusing to engage and cooperate with CorpCar's request that they try to work things out, as Carey was required to do by the implied covenant of good faith and fair dealing.

## D. Curability or Futility?

If a jury finds that Carey repudiated the contract, Carey could still defend based upon the futility of a cure period. While a repudiation relieves the non-repudiating party of its obligation to perform, a "plaintiff must still demonstrate, to recover damages, that he or she had the willingness and ability to perform before the repudiation and would have performed if the defendant had not repudiated." 17A Am. Jur. 2d *Contracts* § 705; *see also* Restatement (Second) of Contracts § 254(1) (Am. L. Inst. 1981) ("A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise."). Thus, we conclude that in order to prevail and obtain damages for breach of contract, CorpCar still must show either that it had already cured the breach or, but for Carey's repudiation, it would

have been willing and able to perform its obligations during the cure period, i.e., that it could have cured the breach within a 30-day opportunity to cure.[23]

We adopt this approach consistent with that of many jurisdictions which allow a terminating party such as Carey to defend a wrongful termination action on the basis that the terminated party could not, as a factual matter, have cured the breach even had it been afforded an opportunity to cure. *See, e.g.*, *Skyco*, 512 P.3d at 22 ("If the entitled party cannot perform (cure), the repudiating party can successfully raise a defense of futility."); *DC Farms*, 317 P.3d at 553 (concluding that failure to comply with a notice-and-cure provision constituted a breach notwithstanding its futility but that the terminating party "may still defend on the basis that the [breach] that caused it to refuse to further perform under the parties' agreement could not be

---

[23] There is some uncertainty in our case law about whether proof of actual monetary damages is an element of a breach of contract claim. *See Moini v. LeBlanc*, 456 F. Supp. 3d 34, 51 (D.D.C. 2020) (identifying a possible conflict in our case law); *compare Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013) (explaining that "the absence of specific monetary injury does not prevent the accrual of a cause of action for breach of contract" and that "a plaintiff who can establish a breach of contract is entitled to an award of nominal damages") *with Tsintolas Realty*, 984 A.2d at 187 ("Mere breach without proof of monetary loss is *injuria absque damno, i.e.,* a wrong which results in no loss or damage, and thus cannot sustain an action." (internal quotation marks, citations, and alteration omitted)). CorpCar claims it suffered financially as a result of Carey's termination of the license agreement. Since the issue has not been briefed, we leave it to the Superior Court to decide in the first instance whether trial on this issue is more appropriately treated as part of a trial on liability or part of a trial on damages only.

cured"); *cf. Duncan*, 479 S.W.3d at 898 (declining to adopt the "vital" breach line of cases but nevertheless affirming the jury verdict in light of "legally and factually sufficient evidence [from] which the jury could have believed that the notice and cure provision would have been futile").

Likewise, our case law recognizes the principle that "the law generally does not require the doing of a futile act." *Miller v. United States*, 14 A.3d 1094, 1115 (D.C. 2011); *see also, e.g.*, *Indep. Mgmt.*, 874 A.2d at 870. While the two overlap to a degree, the futility defense differs from the notion of "incurable breach" in that it calls for a fact-intensive inquiry into whether a party would have been able to take steps sufficient to meaningfully cure the breach, whereas "incurable breach" empowers judges to decide, as a matter of law, that a breach is incurable based on its egregiousness. On this record, the defense of futility poses fact-intensive questions to be resolved by a jury, including: (1) whether CorpCar had already cured the breach prior to the termination notice; or (2) whether it could and would have cured the breach had it been afforded the opportunity to cure.

While ultimately a factual question, this inquiry must be guided by a legal definition of what it means to "cure" a material breach. Case law defining "cure" in this context is surprisingly sparse. The parties have not cited any District of Columbia cases, and we have found none. CorpCar, quoting a federal district court

decision applying state common law, argues that "to cure a material breach means to engage in subsequent conduct that substantially performs or performs without a material failure."[24] *Anacapa Tech., Inc. v. ADC Telecomms., Inc.*, 241 F. Supp. 2d 1016, 1020 (D. Minn. 2002). For this proposition, the *Anacapa* court cited the Restatement (Second) of Contracts § 237 cmt. b, which explains that "[e]ven if the failure is material, it may still be possible to cure it by subsequent performance without a material failure." The Wisconsin Supreme Court adopted the *Anacapa* court's view, and added that "the breaching party had to stop the offending conduct and to substantially perform the contract." *Volvo Trucks N. Am. v. State, Dep't of Transp.*, 779 N.W.2d 423, 432 (Wis. 2010). Notably, curing does not "require[] restoration to the *status quo ante* or repair of all harm done by the breach." *Id*. at 433. (Such harm may still be compensated for in an action for damages.). This formulation accords with well-settled doctrines of material breach and substantial performance. *See* 15 *Williston on Contracts* § 44:55 (4th ed.) ("Substantial performance is the antithesis of material breach; if it is determined that a breach is

---

[24] Carey responds that this standard is "inapplicable" in this case and that its utility is limited to "financial and commercial terms." Elsewhere in its brief, Carey suggests that a cure in the franchise context would require "efforts that would have addressed the harm to Carey's brand and the business relationship and restored trust that the same discriminatory attitudes would not persist, not to mention a resolution to CorpCar's legal jeopardy by compliance with the court order requiring payment to the *Henry* plaintiffs." Carey has not pointed us to any authority for its preferred formulation.

material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered . . . ."); *see also 3511 13th St. Tenants' Ass'n*, 922 A.2d at 445 (material breach); *In re Waller*, 524 A.2d 748, 750 (D.C. 1987) (substantial performance).

To be an effective cure, however, "substantial" performance has to be sustained and designed to prevent recurrence of the breach. As the trial judge stated, and CorpCar has not disputed, CorpCar could not have cured the breach simply by complying with the law for the duration of the cure period. *Cf. Lippo*, 776 F.2d at 715 (explaining that "it would be a question of fact whether a franchisee who repeatedly defaulted on a particular duty and 'corrected' each default only long enough to escape termination had even 'corrected' the default"). For example, in the context of the statutory right to cure lease violations, we have suggested that a cure includes "timely measures . . . to prevent recurrence" of the offending conduct (e.g., excluding the offending member from the household). *Pratt v. D.C. Hous. Auth.*, 942 A.2d 656, 662 (D.C. 2008). Similarly here, substantial performance would entail not only the absence of further violations of law, but also whether CorpCar took sufficient steps to remedy the underlying conditions that led to the egregiously discriminatory conduct for which it was held liable in the *Henry* litigation.

We conclude that the record on this issue is not so one-sided as to warrant summary judgment. Thus, it is for the jury to decide whether CorpCar already had, or could have, substantially performed its contractual obligation to comply with the law and thus cured its material breach. *See Skyco*, 512 P.3d at 23 (explaining that "[s]ummary judgment is appropriate only if a party . . . fails to present evidence of futility"; otherwise, it "is appropriate that a jury decide whether" repudiation was warranted because a cure was impossible).

Carey essentially argues that any attempt to cure would be futile. It emphasizes the severity of the conduct and the fact that the name "Carey of Houston" appears in the case caption of the *Henry* litigation, including the Fifth Circuit's publicly available opinion. The termination letter expressed—and its attachments suggested—that other CorpCar employees had complained to Carey of (unadjudicated) instances of alleged discrimination and harassment from co-workers at CorpCar. Moreover, Carey points to evidence in CorpCar's handling of the termination process, as well as both the *Henry* litigation and this litigation, suggesting that it, and its senior management, continued to fail to appreciate or express genuine remorse for the severity of its Title VII violation.[25]

---

[25] As an example, Carey mentions Mr. Wolfington's response during the TRO hearing that "I was there and nothing racial happened" when asked if he

On the other hand, CorpCar put forward evidence that it had substantially performed. It pointed out that years before Carey's notice of termination, it had entered into a conciliation agreement with the EEOC, made structural changes in its leadership, and implemented diversity trainings. [26] Under the terms of the conciliation agreement, CorpCar was required to, inter alia, conduct annual training sessions for Mr. Wolfington and other management and provide orientation to new hires on racial harassment policies. And it "agree[d] that racially inappropriate activities will not be used at its meetings or any company sponsored activities."[27]

---

believed that what he did, i.e., hiring the singing telegram, had been "racially discriminatory or offensive." However, in a subsequent affidavit, dated August 3, 2017, Mr. Wolfington clarified that "[w]hat I meant to convey is that I did not intend to do anything wrong. The thought never entered my mind that the "singing telegram" would be viewed as racially offensive. But, I fully recognize, that CorpCar's African-American employees were in fact offended by the performance, and deeply regret what occurred." Mr. Wolfington explained that he had previously ordered similar singing telegrams for family and friends that "had always been well received," and that his "sole intention was to entertain during an otherwise mundane meeting," "ignorant of the potential that African-Americans would be very offended." He added that he is "a very different person than what Carey has been portraying me as being," pointing to several initiatives and contributions that he, personally and through CorpCar, had undertaken, both before and after the singing telegram incident, that "demonstrate my lifelong efforts to be supportive of minority groups."

[26] For example, CorpCar removed the employee who, per Mr. Henry's testimony, had said "Here's your Juneteenth" from his general manager position and also promoted "a long-time Black employee" to Vice President of Operations.

[27] The record includes copies of the attendance sheets at the trainings in 2011 and 2012, as well as management's signed acknowledgments of and commitments to CorpCar's racial harassment policies.

Carey argued that failure to pay the judgment meant CorpCar had not cured the breach; however, CorpCar represented that at the time it received the termination letter, it had already paid part of the judgment in the *Henry* case and was in active negotiations to settle the remainder with the plaintiffs and their lawyers.[28] CorpCar also represented that, had Carey responded positively and engaged with CorpCar's request for an opportunity to cure, it would have been willing to take additional steps, such as raising money to pay the judgment in the *Henry* litigation or removing Mr. Wolfington as the CEO of the company.

For that reason, this case differs significantly from *Bennett Enters. v. Domino's Pizza*, relied upon by Carey. 45 F.3d 493 (D.C. Cir. 1995). In that case, the violation of law was failure to pay taxes—by the time the cure period concluded, the franchisee had "started to pay current taxes as they became due" but had yet to pay its tax debt or even "negotiate[] payment plans with Maryland or the IRS." *Id.* at 497. "Thus," the D.C. Circuit concluded, "the evidence was undisputed that

---

[28] The settlement agreements, signed in February 2016 and March 2017, were presented with CorpCar's Rule 59 motion to alter or amend the judgment. Although that motion was denied and the trial court did not consider the documents in deciding the motion for summary judgment, the submission is part of the record on appeal. *See* D.C. App. R. 10. The settlement agreement with the plaintiffs recites that a partial payment was made to lawyers and that "past disagreements" between the plaintiffs and their lawyers "regarding allocation of payment of moneys due pursuant to the judgment . . . have precluded CorpCar from paying the Judgment in full." CorpCar could seek to introduce the settlement agreements at trial.

Bennett was not in compliance with the tax laws at the time of default." *Id.* Here, by contrast, CorpCar's failure to pay the judgment in full does not conclusively show that it was not attempting to fulfill that obligation or that it remained in violation of Title VII or any other antidiscrimination law (or that it was likely to so offend again).

We conclude that it is appropriate for a jury to weigh these competing facts and find, as a factual matter, whether CorpCar was harmed by the denial of the opportunity to cure (if it was so denied, *see supra* Part II.C), or whether termination would have been inevitable at the end of the cure period in any event. Thus, we remand for a jury to decide the disputed question of material fact, whether CorpCar could have, or already had, cured its material breach at the time of Carey's termination.

## III.   Conclusion

In sum, we agree with the trial court that cause existed for Carey to invoke Paragraph V(C). We conclude, however, that disputes of material fact remain as to: (1) whether Carey afforded an opportunity to cure or simply repudiated the contract; and (2) whether CorpCar could have, or already had, cured its material breach at the time of Carey's termination. Depending on how the jury answers those questions, there might also be a factual issue on damages. "We express no opinion on the correct answer to these questions, which are the sort we properly rely on juries to

decide." *3511 13th St. Tenants' Ass'n*, 922 A.2d at 445.  For the foregoing reasons, the judgment of the Superior Court is affirmed in part and reversed in part, and the case is remanded for a jury trial as explained in Parts II.C and II.D of this opinion.

*So ordered*.